356 A.2d 207.

EDITH F. ROBERTS, *Adm'x vs.* DONALD E. KETTELLE *et al.*
PETER CHAPMAN, *Guardian et al. vs.*
DONALD E. KETTELLE *et al.*

APRIL 23, 1976.

PRESENT: Paolino, Acting C. J., Joslin, Kelleher and Doris, JJ.

PAOLINO, J. This case arises from a tragic automobile accident which occurred in the southbound lanes of Interstate Route 95 in the city of Warwick on the night of February 6, 1970. On that evening, seven young people were traveling from Boston, Massachusetts to Old Lyme, Connecticut, in a three-seated, heavy-duty station wagon known commercially as an International Travel-all. Seated from left to right in the front seat were the defendant-driver Martha D. Roberts, the plaintiff's decedent Robin Roberts, and the second plaintiff, Akiko Sasamoto. The middle seat was occupied by Katharine Hotarek and Olivia Campo and the rear seat contained Edward Ritz and Edith Roberts, the sister of the plaintiff's decedent and of the defendant.

This group had spent the day in Boston where Robin resided as a college student and had as their destination the Roberts' home in Old Lyme. Martha, who was 17 years old at the time and who had been a licensed driver for 7 or 8 months prior to the date in question, assumed driving duties that day upon leaving the Boston city limits to which point Edward Ritz had piloted them.

The group proceeded southerly without incident until they reached a point on the highway some seven to eight-tenths of a mile north of the East Greenwich turnoff. At that particular location, the asphalt surface attains a width of four lanes, each lane being 12-feet wide. The two left lanes are clearly marked as East Greenwich-bound while those on the right are equally clearly marked as the through lanes of Interstate Route 95 bound for New York City and other points south. At this juncture Martha swung her vehicle from the third lane in which she had been traveling into the fourth lane in order to pass a slower vehicle. Just as she accomplished this incursion into the left-hand lane, Martha became suddenly aware of defendant state trooper Kettelle's police car which she described as a vehicle with red flashing lights that appeared to have stopped immediately in front of her. She could not then retreat to the third lane as her vehicle was parallel to the automobile which she had intended to pass. She therefore applied the brakes on her Travel-all and swerved to the left in an effort to avoid defendant Kettelle's automobile.

Martha's efforts were to no avail in that her vehicle struck the rear of the preceding vehicle with enough force to leave the latter facing in the direction from which it had come, and her own car struck the guardrail located on the median area and overturned once coming to rest on its side. As a result of the mishap Robin Roberts was killed and Akiko Sasamoto suffered severe personal injuries resulting in several hospitalizations for the treatment of a fractured pelvis, a fractured lumbar vertebra and a ruptured spleen.

While these events were unfolding, a separate set of facts was developing which have a bearing on several aspects of this case. On the same evening when Martha Roberts and company sojourned homeward on Interstate

Route 95, a noted local underworld figure and his female companion were killed by shotgun blasts emanating from a late model white Cadillac with out-of-state registration plates as the pair left the woman's home in the Pawtuxet section of Cranston. A description of said vehicle was broadcast to all state police vehicles and all officers were advised to be on the lookout in order to avert the alleged gunman's escape from the state of Rhode Island.

Trooper Kettelle was traveling southward on Interstate Route 95 in the city of Warwick near the interchange of Rhode Island Route 117 when he received the above-described bulletin. He decided to assume a post about 2 miles south of Route 117 in a dirt and macadam path marked "Official Use Only" which traverses the median area just north of the East Greenwich turnoff described in the first part of this opinion. As he approached his destination he directed his car into the fourth left-hand lane and began to decelerate. Kettelle testified that at this point in time he activated his red flashing signal light in order to avoid becoming "a sitting duck." It is unclear whether this comment indicates that his intention in lighting the signal apparatus was to announce his presence to following vehicles and thus to avoid any rear-end collisons or whether he intended to evade detection by the suspected killers. When he was two-to-three-tenths of a mile north of the so-called "official turnoff," trooper Kettelle's vehicle was traveling, by his own estimate, no more than 40 miles per hour and, by some witnesses' estimates, his vehicle was at a complete standstill. The maximum speed allowed on that stretch of road on that date in 1970 was 60 miles per hour and the minimum allowable speed was 15 miles per hour less or 45 miles per hour. In any event, it was at this juncture that the Roberts' vehicle, being operated as described above, came into contact with the Kettelle vehicle.

Actions were instituted in the Superior Court by the estate of the decedent Robin Roberts for wrongful death and on behalf of Akiko Sasamoto, a minor and a citizen of Japan, for pain and suffering and medical expenses. Both complaints named the driver Martha D. Roberts and trooper Kettelle as parties defendant.

The cases came to trial before a justice of the Superior Court and a jury in June 1974. On June 10, 1974, the jury returned verdicts in favor of each plaintiff against each defendant. Damages in the wrongful death suit were assessed against defendant Kettelle in the amount of $40,000 and against defendant Martha D. Roberts in the same amount. In the personal injury action the award was $2,800 for medical expenses to Peter Chapman, Guardian, against both defendants and $5,000 for pain and suffering in favor of Akiko Sasamoto, p.p.a., against both defendants. Upon the recording of the verdict, counsel for plaintiffs objected on the ground of his belief that the jury had misunderstood the trial justice's instructions and halved the awards. He opined that the verdicts should be doubled and moved that the jury be polled as to the amount of the award intended by them. The justice denied the motion upon a finding that the jury had clearly followed the instructions and the jury was polled in the ordinary manner, each juror responding that he or she intended an award of $40,000 against both defendants in the wrongful death suit. Judgments were entered accordingly.

At this juncture, the trial justice denied the motions for a directed verdict of each defendant upon which decision had been reserved. All parties thereupon filed Super. R. Civ. P. 59 motions for a new trial; defendants on the ground that the verdict was against the law, the evidence and the weight thereof, and plaintiffs on the ground that the damages were grossly inadequate. The plaintiffs also

filed a so-called "Motion for Relief" under Super. R. Civ. P. 60 and accompanied said motion with the affidavits of each of the 12 jurors who sat on the case to the effect that each had intended that the damages in the wrongful death action were to be $80,000 against both defendants and that the award to Akiko Sasamoto was intended to be $2,800, medical expenses, and $10,000, pain and suffering.

The trial justice denied the motions for new trial filed by each defendant and the Rule 60 motion filed by plaintiffs. Regarding the latter motion, the trial justice ruled that a motion which directs the court to consider affidavits of the jury is inappropriate and not the proper subject matter for Super. R. Civ. P. 60. The trial justice then proceeded to reject consideration of the affidavits in the context of plaintiffs' Super. R. Civ. P. 59 motions for a new trial. Upon full consideration of those motions, however, the trial justice found, on the basis of all relevant evidence other than the jurors' affidavits, that the jury's award was inadequate to compensate for the losses suffered. The motions for a new trial were therefore granted in both cases on the issue of damages alone unless the defendants filed an additur of $50,000 in the wrongful death action, raising the total verdict to the full sum of $90,000, and an additur of $10,000 in the personal injury action, thereby increasing the total verdict in that case to $15,000. Orders to this effect were entered on July 3, 1974.

All parties filed appeals in this court. These appeals raise several significant issues and for the sake of clarity each will be dealt with individually.

# I

The first point raised by defendant Kettelle in his appeal from the denial of his motion for a directed verdict is that because he was responding to an emergency call displaying his emergency signal lights, he was exempt from

the minimum speed regulations. On this basis, he asserts that no negligence can be ascribed to him and that he is thus entitled to have a verdict directed in his favor. He cites G. L. 1956 (1968 Reenactment) §31-12-6[1] as the source of this exemption and the gravamen of his position is that the operator of an emergency vehicle enjoys a per se exemption from vehicle speed laws. The defendant Kettelle is of the belief therefore that his traveling at a speed less than the 45 miles per hour minimum was, in these circumstances, nonnegligent. The defendant Roberts, who relies on a finding of Kettelle's negligence in order to enjoy the partial shelter of joint and several as opposed to sole liability, vigorously opposes this position. In her brief, defendant Roberts joins in the position of plaintiffs and asserts that Kettelle's argument under §31-12-6 conveniently omits reference to the companion provision §31-12-9.[2] The thrust of this argument is that the latter section, in specifying that the law does "* * * not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons" or "* * * protect the driver from the consequences of his reckless disregard for the safety of others," imposes a duty of due care on the drivers of emergency vehicles.

The statutes in question do, indeed, provide for certain

---

[1]General Laws 1956 (1968 Reenactment) §31-12-6 reads as follows:

"Emergency vehicles—Times when entitled to special privileges.— The driver of an authorized emergency vehicle, when responding to an emergency call or when in the pursuit of an actual or suspected violator of the law or when responding to but not upon returning from a fire alarm, may exercise the privileges set forth in §31-12-7, but subject to the conditions stated in §§31-12-8 and 31-12-9."

[2]General Laws 1956 (1968 Reenactment) §31-12-9 reads as follows:

"Due care by emergency vehicles.—The foregoing provisions shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of his reckless disregard for the safety of others."

privileges to be extended to drivers of emergency vehicles and the operation of these privileges will negate an allegation of negligence. This statutory exemption, however, is contingent upon the results of a two-tiered inquiry. At the threshold, the finder of fact must determine whether a vehicle indeed qualifies as an emergency vehicle under the statute. Secondly, if it is found that an emergency exists, the finder of fact must focus its investigation on the question of whether the driver's conduct in the emergency constitutes a reckless disregard for the safety of others. Conversely, if no emergency is found to exist, the driver's conduct is to be scrutinized under standards applicable to all other drivers, that is, whether he was negligent.

Our review of the language of §31-12-6 and of the cases in other jurisdictions interpreting similar statutes leads us to conclude that a vehicle is "responding to an emergency call" when the occupant or occupants of said vehicle honestly believe that an emergency exists and when that belief is a reasonable one. *Bravata* v. *Russo,* 41 Misc.2d 376, 378, 245 N.Y.S.2d 702, 704 (1963).

We direct our attention now to the standard to be applied in evaluating the conduct of a driver in emergent circumstances. We clearly cannot accept defendant Kettelle's view that the driver of an emergency vehicle is entitled to a per se exemption from traffic speed regulations. Section 31-12-9 clearly delineates the parameters of the privilege by imposing upon such drivers a "duty to drive with due regard for the safety of all persons." That section further denies protection under the privilege to such drivers who execute their duties with a "reckless disregard for the safety of others." These terms have specific legal meanings which, in the absence of contrary indications, we will assume the General Assembly intended them to have as employed in §31-12-9. Recklessness is perceived

by virtually all authorities to differ in kind rather than in degree from negligence. *E.g.*, Prosser, *Torts*, §34 at 185 (4th ed. 1971). This court has held that recklessness, in the context of a penal statute, imparts a disregard by the accused for the consequences of his act and an indifference to the safety of life and limb. A driver of a motor vehicle may be convicted of reckless operation of said vehicle where the evidence shows that he has embarked upon a course of conduct which demonstrates a heedless indifference to the consequences of his action. *State* v. *Lunt*, 106 R. I. 379, 383, 260 A.2d 149, 151 (1969). We believe that this characterization of recklessness is equally appropriate in the context of the remedial statute under consideration here. Thus, where the driver of an authorized emergency vehicle, when responding to an emergency call, operates his vehicle in such a manner as to demonstrate a heedless indifference to the consequences of his action, the finder of fact must conclude that he has exhibited a reckless disregard for the safety of others and thus withhold the privileges extended to him under §31-12-6.

We reiterate at this point that an initial finding that no emergency existed obviates the necessity to inquire into the question of whether the driver exhibited a reckless disregard for the safety of other users of the highway. Such a nonemergency driver is bound by all the rules of the road and other traffic regulations and is liable for the consequences of his negligence.

We turn now to a consideration of the trial justice's denial of defendant Kettelle's motion for a directed verdict. In passing on such a motion, the trial justice must view all the evidence in the light most favorable to the adverse parties, draw all reasonable inferences from the evidence favorable to those parties, and refrain from weighing the evidence and passing upon the credibility of the witnesses. If, after taking such a view, the trial justice concludes

that there exist issues upon which reasonable men might draw conflicting conclusions, the motion for the directed verdict should be denied and the case submitted to the jury for its determination. *Ballet Fabrics, Inc.* v. *Four Dee Realty Co.*, 112 R. I. 612, 618, 314 A.2d 1, 4-5 (1974). Our review of the record insofar as it reflects the trial justice's deliberations on the present issue reveals that he correctly perceived and executed his duty. We hold that he was also correct in his conclusion that reasonable men might reach differing conclusions regarding the emergent nature of the call to which defendant Kettelle was responding at the time of the collision and regarding the question of his negligence under the circumstances. There is evidence on the record which, when viewed in the light most favorable to plaintiffs and to defendant Roberts, reasonably supports the conclusions that no emergency existed and that defendant Kettelle was negligent. Regarding the existence of an emergency, the evidence shows that Kettelle was under no specific instructions to assume the particular post in the "official turnoff"; that he was responding to an all-points bulletin regarding the shooting suspects; and that, even assuming the suspects would be fleeing by way of Interstate Route 95, he was at least several minutes ahead of such suspects. Regarding the question of Kettelle's negligence there is evidence that he was driving well below the minimum allowable speed while in the "high-speed" lane of the highway. There was even testimony to the effect that his vehicle was not completely on the road surface and that it had come to a complete stop there. We find no error in the denial of defendant Kettelle's motion for a directed verdict,[3] in the

---

[3]The defendant Roberts also submitted a motion for a directed verdict on the ground that Rhode Island law does not permit intrafamilial suits between siblings. The issue, though argued by all concerned parties in their briefs, was waived for consideration at oral argument by agreement of counsel.

submission of these questions to the jury, or in the manner that they were submitted.

## II

The defendant Kettelle further claims in the context of the denial of his motion for a directed verdict, that even if his conduct was negligent, such negligence could not, as a matter of law, constitute a proximate cause of plaintiffs' injuries. His position is that such conduct created no more than a past condition or circumstance which left defendant Martha Roberts' failure to keep a lookout as the sole proximate cause of said injuries. To support this contention, defendant offers the case of *Burr* v. *Fall River News Co.*, 75 R. I. 476, 67 A.2d 694 (1949), wherein this court upheld a directed verdict in favor of the defendant which had been premised upon uncontradicted evidence that a collision of the plaintiff's automobile with the rear end of the defendant's truck was proximately caused by the blinding headlamps of an oncoming bus rather than the absence of a visible taillight from the rear of the defendant's truck. This court held on those facts that the failure to maintain such taillights, though negligent, became merely a past condition or circumstance which was displaced by an intervening independent cause so that such original negligence in no way continued to operate effectively in whole or part as the proximate or concurring cause of the accident. *Id.* at 481-82, 67 A.2d at 696-97. *Accord, Brey* v. *Rosenfeld*, 72 R. I. 316, 321-22, 50 A.2d 911, 913 (1947). We fail to perceive the applicability of this doctrine to the facts of the case at bar. For negligent conduct to be considered a past condition or circumstance, the *Burr* test requires that such negligent conduct must have become totally inoperative as a cause of the injury. We cannot accept defendant Kettelle's proposition that his negligence in driving slowly in the high-speed lane of Interstate Route 95 was rendered totally inoperative by

the intervening negligence of Martha Roberts. The jury was clearly justified in finding that the negligence of both defendants concurred to produce the proximate cause of plaintiffs' injuries.

In *Aldcroft* v. *Fidelity & Cas. Co.*, 106 R. I. 311, 259 A.2d 408 (1969), we held that an intervening act will not insulate a defendant from liability if his negligence was a concurring proximate cause which had not been rendered remote by reason of the secondary cause which intervened. The test for remoteness is whether the intervening act could reasonably have been foreseen as a natural and probable result of the original act of negligence of the defendant. If it could have been so foreseen, the intervening negligence is not so remote as to prevent the original act from being considered at law as merely a concurring cause of the injury. *Id.* at 314, 259 A.2d at 411. In the case presently before us, it seems clear that defendant Kettelle could reasonably have anticipated that another vehicle being negligently driven at a rate of speed in excess of the maximum speed limit would approach him from the rear in the high-speed lane of an interstate highway. Thus, his original negligence is not so remote as to be considered merely a past condition or circumstance. The question was properly submitted to the jury for their consideration of whether the negligence of both defendants concurrently caused plaintiffs' injuries.

### III

The defendant Kettelle's next assignment of error is that the trial justice erred in his instruction to the jury regarding proximate cause. The substance of his position is that, after having defined proximate causation to the jurors, he failed to instruct them that a verdict could not be rendered against a defendant unless negligence on the part of that particular defendant was found to be the proximate cause of the accident. The instruction as it was

delivered to the jury, in defendant Kettelle's view, invited a verdict against him upon a finding that his conduct factually rather than proximately caused the mishap.

This court has often expressed the rule that, in the absence of peculiar circumstances, an imprecise portion of a charge shall not be lifted from its context in order to determine whether or not its effect was prejudicial. *Nardolillo* v. *Ward Foods, Inc.*, 113 R. I. 255, 259, 319 A.2d 651, 654 (1974). A reading of even that short portion of the instruction quoted in defendant Kettelle's brief indicates that the instruction, when read as a whole, clearly conveys to the jury the fact that a verdict for plaintiffs would require the two-part finding that defendant was negligent and that his negligence was the proximate cause of the injury. We hold therefore that there was no error in the trial justice's instruction to the jury regarding defendant Kettelle's negligence as the proximate cause of plaintiffs' injuries.

A second challenge to the trial justice's instructions relates to that portion of those instructions which is recorded in the transcript as follows:

> "The driver of an authorized emergency vehicle when responding to an emergency call *and* when in the pursuit of actual or suspected violator of the law * * * may exercise the privileges set forth in the statute." (Emphasis added.)

The defendant Kettelle alleges that by substituting the italicized word *"and"* in place of the word "or" which appears in §31-12-6[4] the trial justice gave the jury the impression that Kettelle must have been in the actual pursuit of an alleged violator of the law in order to be entitled to the privileges under the statute. Since he was clearly not engaged in such pursuit, defendant contends that this amounted to an instruction that he was negligent.

---

[4]See note 1 *supra* for text of G. L. 1956 (1968 Reenactment) §31-12-6.

This question may be disposed of in the same manner as the previous question. That is, we must examine the charge as a whole in order to determine whether any part thereof was prejudicial to defendant's case. *Handy* v. *Geary*, 105 R. I. 419, 432, 252 A.2d 435, 442 (1969).

The trial justice did use the conjunctive "and" instead of the disjunctive "or" as he alluded to the statute which lists the times when a driver of an authorized emergency vehicle can exercise the privileges delineated in §31-12-7, but he also informed the jury that the police car was an authorized emergency vehicle and that the one issue to be decided was whether Kettelle was responding to an emergency call. The trial justice pointed out to the jury that since there was no statutory definition of what constitutes an emergency call, he would refer them to the dictionary definition of "emergency," which he read to them as "an unforseen combination of circumstances which calls for immediate action." We believe that when the emergency call portion of the charge is read and listened to in its entirety, the jury was fully informed that it could find that Kettelle was responding to an emergency call in an authorized vehicle and that, as such, he was entitled to use the privileges listed in §31-12-7. The panel was also told that the statutory privileges afforded no protection to Kettelle if he operated his vehicle in reckless disregard of the safety of others. The trial justice's inadvertent reference to "and" instead of "or" might have been erroneous, but it was totally harmless.

## IV

The defendant Kettelle continues by raising several interrelated challenges to the trial justice's denial of his motion for a new trial. Essentially, all the points he raises in this respect amount to a broad allegation that the trial justice misconceived or disregarded evidence regarding defendant's statutory exemption from speed laws, defend-

ant's use of flashing signal lights and the question of Martha Roberts' intervening negligence. This is coupled with a general assertion that the verdict against Kettelle was contrary to the weight of the credible evidence.

A trial justice, when acting on a motion for a new trial, has been characterized as "a thirteenth juror." His duty is to independently review all material evidence in the light of his charge to the jury, passing upon the weight thereof and assessing the credibility of the witnesses who have appeared before him. He may reject some evidence or testimony, either because it was impeached or contradicted, or because other circumstances render it inherently improbable. He is also at liberty, in ruling on such a motion, to draw such inferences as are reasonable in view of other testimony and evidence which are in the record. *Gordon* v. *Campanella Corp.*, 112 R. I. 417, 420, 311 A.2d 844, 847 (1973).

Turning to the present case, we note that the trial justice, after correctly reciting his duty in this regard, embarked upon a lengthy review of the record evidence bearing on the issue of defendant Kettelle's liability, drawing therefrom several inferences consistent with the jury's finding that Kettelle and Martha Roberts were concurrently negligent. Specifically, the trial justice made note of the fact that every witness, except Kettelle, while admitting that Kettelle's signal light was operating, testified that it was observed for only a span of four to five seconds. It was also pointed out that several statements made by defendant Kettelle himself were at variance with other prior segments of his in-court testimony. The Superior Court justice surmised, therefore, that defendant Kettelle failed to utilize his signal light until he was in the high-speed lane and within an area only several hundred yards from the turnoff he was seeking. He concluded that, weighing all the evidence, it was his opinion that without the

concurrent negligence of both drivers, Kettelle in turning his signal light on in close proximity to the scene of the accident and Martha Roberts in failing to keep a proper lookout, the mishap would not have occurred. The defendant Kettelle has failed to persuade us that the trial justice, in passing on his motion for a new trial, was clearly wrong or that he overlooked or misconceived material evidence on a controlling issue in this case. Thus, we find no error in the denial of defendant Kettelle's motion for a new trial.

## V

On their appeal, plaintiffs' primary contention is that the trial court erred in rejecting the affidavits of all 12 jurors and in consequently denying their Super. R. Civ. P. 60 "Motion for Relief." They argue that, because these affidavits were offered in this case only to show that the jury's true verdict was not recorded, the rule that a verdict rendered by a jury may not be impeached upon evidence from a juror is inapplicable. The plaintiffs maintain that an enlightened construction of the Rules of Civil Procedure would permit the use of affidavits to correct an obviously inadvertent mistake.

Even though the decisions of many courts support the view that where a jury's error is latent and not apparent from the face of the verdict it may be proper to receive affidavits from individual jurors to ascertain the true verdict, *see, e.g., Freid* v. *McGrath*, 135 F.2d 833, 834 (App. D.C. 1943), we are of the opinion that a contrary rule is dictated by considerations of sound public policy. This court has unwaveringly adhered to the position that jurors' affidavits when offered to prove what any of the jurors may have done either before or during their deliberations cannot be used to impeach their verdict. *State* v. *Palmigiano*, 115 R. I. 166, 168, 341 A.2d 742, 743 (1975). The rule is solidly grounded in the premise that admission of

such affidavits undermines the stability of jury verdicts and corrodes the purity of trials by jury. *Phillips* v. *Rhode Island Co.*, 32 R. I. 16, 21, 78 A. 342, 343 (1910). We perceive no reason why this rule should not apply with equal force to a situation where the alleged error is that the jury erroneously reported its true verdict. The public interest requires that litigation be terminated and to that end the jury verdict should possess a conclusiveness that will preserve the stability of the jury trial as an instrument for doing substantial justice. *Palumbo* v. *Garrott*, 95 R. I. 496, 502, 188 A.2d 371, 374 (1963). To allow jurors' affidavits even for the limited purpose sought here would tend to pollute our system of independent deliberations by the jury. Every party who was dissatisfied with a jury verdict would feel able at least to attempt to effect a revision thereof. Such a situation leaves jurors open to harassment and intimidation long after they have been discharged from their official duties and thus after they are outside the watchful eye of the court.

In view of the foregoing we find no error in the denial of plaintiffs' Super. R. Civ. P. 60 "Motion for Relief" on the ground that the affidavits submitted in conjunction therewith were inadmissible.

## VI

The final issue raised by these appeals is whether the trial justice erred in granting plaintiffs' motions for a new trial unless defendants consented to additurs of $50,000 and $10,000 in the Roberts and Sasamoto cases respectively.

As a corollary to their position that the jury erred in its reporting of the verdict to the court, plaintiffs contend that, at the very least, they were entitled to a new trial on the question of damages as per their Super. R. Civ. P. 59 motions. They contend further that the trial justice was correct and justified in finding that the verdicts as

reported were grossly inadequate and thus in granting the motions for a new trial on the issue of damages conditional upon agreement to additurs by both defendants.

The defendants retort by suggesting that a trial justice is justified in setting aside a verdict only if it reflects passion, prejudice, partiality or corruption. They argue that the reported verdicts in this case were not contrary to the weight of the evidence or grossly inadequate; that damages, especially in a case for wrongful death, are extremely speculative; that the trial justice abused his discretion and invaded the province of the jury by revising the amounts originally awarded; and that the trial justice, while disallowing the use of affidavits in ruling on a motion for a new trial, was obviously influenced by the jurors' affidavits submitted in this case.

In ruling on a motion for a new trial on the ground of inadequacy of damages, a trial justice has fundamentally the same duties as he has in passing on motions for a new trial generally. As noted above, he acts as the "thirteenth juror" and in the exercise of his independent judgment he must weigh all the material evidence on the question of damages and pass on the credibility of the witnesses. After the evidence-sifting process is completed, and liability is established, a new trial on the question of damages should be granted, if there is a demonstrable disparity between the award and the damages sustained such that the verdict is not truly responsive to the merits of the controversy and fails to do substantial justice between the parties. *Grenier* v. *Royal Cab, Inc.,* 114 R. I. 11, 15, 327 A.2d 272, 274 (1974). If the trial justice finds that a new trial is warranted on the question of damages, it is his duty, before ordering a new trial thereon, to give the plaintiff an opportunity to file a remittitur or the defendant

302

an additur. 1 Kent, *R. I. Civ. Prac.* §59.4 (1969).[5] This court will not disturb a trial justice's finding that an award is grossly excessive or inadequate unless he is clearly wrong. *Armes* v. *United Elec. Rys.*, 74 R. I. 450, 451, 62 A.2d 131, 131 (1948).

In the instant case, the trial justice, correctly perceiving his duty in the circumstances, thoroughly reviewed the record evidence and preserved on the record those facts which influenced his decision. He justified the additur of $10,000 in the Sasamoto case by exhaustive recitation of the testimony bearing on the extent of her injury and the pain and suffering to which she was subjected insofar as each had a bearing on the amount of damages. The trial justice admitted that plaintiff Sasamoto had made a good recovery and had returned to most normal activities by June 1970, but he made express note of uncontradicted evidence that she suffered some residual effects of the injuries such as the loss of her spleen, abdominal scars from the surgery, and a sensitivity to temperature changes. On the basis of these findings we cannot say that the trial justice was clearly wrong in granting a new trial on the ground that the award was inadequate or that the additur of $10,000 represented an abuse of discretion.

Responding to the motion for a new trial on the issue of damages in the Robin Roberts wrongful death action, the trial justice recalled for the record all of the trial testimony regarding the Roberts family's status in life and the expert testimony as to Robin's projected life income and expenses. He noted that her income could con-

---

[5]This practice stems from G. L. 1956 (1969 Reenactment) §9-23-1 which was repealed by P. L. 1972, ch. 169, §9. Section 9-23-1 provided specifically that additurs or remittiturs be made available as alternatives to new trials on the question of damages. The practice remains viable by virtue of the provision of Super. R. Civ. P. 59(a)(1) that new trials are available after a jury trial "* * * for any of the reasons for which new trials have heretofore been granted * * *."

ceivably range from $196,000 to $235,000 as a potential college graduate. We hold in these circumstances, therefore, that the trial justice did not err in his conclusion that the verdict of $40,000 against both defendants did not truly respond to the merits of the controversy and that it failed to achieve substantial justice between the parties, nor did he err in granting the plaintiffs' motion for a new trial unless the parties filed an additur of $50,000.

The plaintiffs' appeals are denied and dismissed. The defendants' appeals are also denied and dismissed. The judgments and orders appealed from are affirmed and the case is remitted to the Superior Court for further proceedings.

*Joseph A. Kelly, Carroll, Kelly & Murphy,* for plaintiffs.

*Joseph V. Cavanagh,* for defendant Donald E. Kettelle.

*Charles H. Anderson,* for defendant Martha D. Roberts.