410

387 A.2d 1386.

JOSEPH T. PIMENTAL, *alias v.* ROBERT BUTTERFIELD *et al.*

JULY 7, 1978.

PRESENT: Bevilacqua, C.J., Joslin, Kelleher, Doris and Weisberger, JJ.

JOSLIN, J.   This civil action was brought in the Superior Court to recover damages for injuries allegedly sustained in a rear-end collision. The case was tried to a jury which returned a verdict for the plaintiff of $23,300, representing $3,300 in special damages for lost wages and medical expenses and $20,000 for pain and suffering. After judgments had entered and on the defendants' motions, the trial justice ordered a new trial solely on the issue of damages unless the plaintiff remitted all of the verdict in excess of $7,700. Both the plaintiff and the defendants appealed.

Early on the morning of November 8, 1972, plaintiff was driving south on Narragansett Boulevard in the city of

Cranston when he was stopped by a police officer to permit election-night celebrants departing a nearby hotel to cross the street. Just after he came to a complete stop, plaintiff's vehicle was hit in the rear by one owned and operated by defendant Butterfield. Then, as plaintiff was alighting, his automobile was struck a second time when the vehicle operated by defendant William Dooley and owned by defendant Norwood Leasing Co. hit the rear of the Butterfield vehicle and pushed it into plaintiff's. The plaintiff was then partly in and partly out of his vehicle, and when his automobile rolled forward as a result of the impact, his leg was dragged along the pavement 3 or 4 feet. The rear of plaintiff's vehicle and the front of Dooley's were both damaged, but Butterfield's was not.

The plaintiff testified that immediately after the incident he felt "pretty well," and that although he told the police officer on the scene that he was not injured, later that day he felt a pain in his neck which spread down into his lower back and left leg. When the pain increased during the next few days, he sought medical attention, first from his family physician on November 11, 15 and 20 and then on the following day from an orthopedist who had previously treated him for sciatica in the lower back and legs. Dissatisfied with the results of those visits, he went to another physician on November 27th and was eventually referred to Dr. Henry Laurelli, a neurosurgeon, whom he saw for the first time on December 4, 1972.

Doctor Laurelli prescribed a week's bed rest, to be followed by a gradual resumption of regular activities, and his report after plaintiff's next visit on December 21 notes that "[t]his patient is recovering from probably lumbrosacral disc disease." The plaintiff did not return to Dr. Laurelli until March of 1973 when he complained of low back pain, radiating down his right leg. No objective findings were made at that examination, but x-rays were scheduled and an elective myelogram was discussed. That myelogram was not performed, however, and no treatment was instituted.

Little more than a year later plaintiff, who in the meantime had received no medical attention, returned to Dr. Laurelli complaining of a worsening of the low back and right leg pain. This time, the doctor noticed a diminished reflex response and some muscular weakness. Acting on Dr. Laurelli's recommendation, plaintiff was hospitalized and a myelogram and other diagnostic tests were performed. The myelogram results were negative, but an electromyogram showed mild nerve root irritation at the fifth lumbar and first sacral nerves.

At trial, Dr. Laurelli testified that his diagnosis of plaintiff's condition was "lumbar disc disease," that it was a "reasonable medical certainty" that "the second impact [was] the most likely [cause] of the symptoms that he saw me for," that the condition would probably continue througout plaintiff's life, that there was no specific treatment that would cure the disease, and that the medication he prescribed was to alleviate morning stiffness rather than to effect a cure. He further testified that he believed plaintiff's complaints of constant pain, but that those complaints were not "serious enough that he should be overly concerned by them."

Notwithstanding his complaints, plaintiff's injuries did not interfere with his regular employment with the Middletown School Department except for 17 days in December 1972, when Dr. Laurelli advised bed rest and a gradual resumption of regular activities. The plaintiff did not, however, resume his customary summer employment. That employment involved more physical exertion than did his regular job, and he testified that because his condition made it impossible for him to engage in that work during the summers of 1973 and 1974, he lost income of $600 in each of those years. He also testified that he did not take the medication prescribed by Dr. Laurelli for morning stiffness, but instead tried "to live with his pain."

Although all defendants have appealed, defendants Dooley and Norwood Leasing have merely responded to the

contentions advanced by plaintiff and have not argued in behalf of their own appeals. The defendant Butterfield, however, contends that the trial justice erred in refusing to grant him a new trial on all issues.

For purposes of his appeal, Butterfield concedes that his vehicle struck plaintiff's twice, and he does not deny that his negligence caused the first impact. He argues, however, that the second impact — the impact that was the sole cause of plaintiff's injuries — was an intervening cause, that it could not reasonably have been foreseen as a natural and probable consequence of his original negligent act, that it displaced and rendered inoperative that original negligence and that it therefore relieved him from liability.

We do not fault Butterfield's summary of the controlling law with respect to when an intervening act will insulate a defendant from liability for his own prior negligence. *See Roberts* v. *Kettelle,* 116 R.I. 283, 294-95, 356 A.2d 207, 214-15 (1976); *Aldcroft* v. *Fidelity & Casualty Co.,* 106 R.I. 311, 314, 259 A.2d 408, 411 (1969); *Denisewich* v. *Pappas,* 97 R.I. 432, 436-37, 198 A.2d 144, 147-48 (1964). But, contrary to what might be anticipated of a litigant who sets forth that law at some length, Butterfield does not contend that the trial justice failed to instruct the jury in accordance therewith. Neither does he argue that the trial justice, in passing on his motion for a new trial, failed to satisfy his obligations under the rule in *Barbato* v. *Epstein,* 97 R.I. 191, 193-94, 196 A.2d 836, 837 (1964), or that, in the performance of those obligations, the trial justice either overlooked or misconceived material evidence or was otherwise clearly wrong.

Instead, Butterfield argues only that the jury's implicit, and the trial justice's explicit, finding that he should have foreseen and anticipated the second impact as being likely to occur strains credulity and constitutes an absurdity. Arguments of that kind, however, while appropriate on a motion

for a direction, in final argument to a jury or on a motion for a new trial, are inappropriate at this level. *See Marstan Corp.* v. *Centreville Realty Co.*, 106 R.I. 36, 38, 256 A.2d 26, 27 (1969).

We turn now to plaintiff's contention that the trial justice erred when he ordered a new trial solely on the issue of damages unless plaintiff consented to a reduction of the jury's award from $3,300 to $2,700 for special damages and from $20,000 to $5,000 for pain and suffering.

Rather than extend the length of this opinion by a recital of either a trial justice's obligations in passing on a motion for a new trial on the ground that the damages are excessive or of this court's duty in reviewing a trial justice's decision on that kind of motion, we refer to our recent decisions delineating the controlling principles and acknowledge our reliance on those principles in the discussion which follows. *Wood* v. *Paolino*, 112 R.I. 753, 315 A.2d 744 (1974); *accord, Roberts* v. *Kettelle*, 116 R.I. at 301-02, 356 A.2d at 218; Fontaine v. *Devonis*, 114 R.I. 541, 551, 336 A.2d 847, 854-55 (1975); *Lebon* v. *B.L. & M. Bottling Co.*, 114 R.I. 750, 754, 339 A.2d 272, 274-75 (1975); *Grenier* v. *Royal Cab, Inc.*, 114 R.I. 11, 15, 327 A.2d 272, 274 (1974).

In this case the trial justice, after carefully reviewing the material evidence, reduced the award of $3,300 for special damages by $600. The plaintiff's challenge to that reduction centers on the asserted inconsistency of the trial justice's approving, on the one hand, the jury's award of $600 for damages for lost time from his customary summer employment in 1974, and, on the other hand, disapproving its award of a like amount for the summer of 1973. If he was unable to work during the summer of 1974, plaintiff insists, it naturally and rationally follows that he was similarly disabled during the summer of 1973.

The trial justice did not ignore this question, and in his decision he specifically notes the absence of any medical

testimony supporting plaintiffs claim that he lacked the capacity to engage in his regular summer employment in 1973; he calls attention to plaintiff's failure to seek medical advice for almost a year subsequent to March 1973; and he comments on the medical testimony that, as the summer of 1974 approached, the irritation to plaintiff's fifth lumbar and first sacral nerves was disclosed by a myelogram, that a weakness developed in his right leg muscle, that there was no Achilles' reflex, and that his condition generally worsened.

On the basis of the foregoing evidence, the trial justice concluded that the probative evidence, while furnishing a premise for an inference of a loss of 1974 summer earnings, failed to provide a satisfactory underpinning for a like inference with respect to 1973 summer employment. We are unable on this record to say that the trial justice lacked a reasonable basis for that conclusion, or that his decision is premised upon an oversight or misconception of material evidence on a controlling issue or that it is otherwise clearly wrong. Accordingly, we find no error in so much of the decision as orders a remittitur of $600 of the amount awarded by the jury for special damages.

The plaintiff also challenges the trial justice's reduction of the jury's award for pain and suffering from $20,000 to $5,000. That contention presents somewhat different problems from those encountered when the issue is liability or damages for out-of-pocket expenses. The question of an injured litigant's entitlement to damages for pain and suffering is a matter peculiarly within a jury's province and on a motion for a new trial its conclusion should not be disturbed by a trial justice unless he is satisfied that there is a demonstrable disparity between the amount awarded and the pain and suffering shown to have been endured as a consequence of the injury sustained, or, as the rule is sometimes stated, unless the award shocks his conscience or clearly demonstrates that the jury was influenced by passion or prejudice, or that it proceeded upon a clearly erroneous basis in arriving at its award.

■ Here the trial justice, while recognizing that plaintiff would undergo some pain and discomfort for the remainder of his life, found that plaintiff's condition would not be so "disabling" and "* * * of such a nature that it would require him to take medication since he was not taking medication." Based on that finding, he concluded that an award of $20,000 for the pain and suffering associated with a non-disabling injury and for which no medication was being taken was so grossly excessive that it shocked his conscience. Accordingly, he reduced the jury's award from $20,000 to $5,000.

We feel that the reduction was based upon a misconception of the evidence concerning the medication prescribed by Dr. Laurelli. Contrary to what is implicit, if indeed not explicit, in the trial justice's action is the assumption that the medication was intended as a cure for plaintiff's complaints of constant pain and suffering. But that is not a valid assumption, for Dr. Laurelli categorically stated that there was no specific treatment that could cure plaintiff of constant pain and that the medication was prescribed, not to remedy that pain, but to relieve morning stiffness.

Because the trial justice misconceived the significance of Dr. Laurelli's testimony, his decision lacks the persuasive force it would otherwise possess. We therefore must apply the appellate rule which calls for us to test the jury's award by an exercise of our judgment and an application of our experience in the affairs of life and of our own knowledge of social and economic matters.

■ The application of that standard discloses that the plaintiff, who has a life expectancy of slightly more than 31 years, is destined to suffer constant pain throughout the remainder of his life. True, that pain will not be disabling, and true, also, that it does not warrant the plaintiff's being "overly concerned." Yet, it will probably persist so long as he lives and there is no available cure. While no rule of thumb nor legal litmus was available to the jury, or is now available to us, for computing what will constitute adequate compen-

sation, we are satisfied that a verdict of $20,000, when viewed in the light of the applicable standard, neither shocks the conscience nor suggests that the jury was influenced by passion or prejudice or that its verdict for pain and suffering was for any other reason clearly erroneous.

The plaintiff's appeal is sustained in part and overruled in part, the defendants' appeals are overruled, the judgment in the plaintiff's favor is sustained in part and overruled in part, and the defendants are entitled to a new trial on the issue of damages unless the plaintiff files a remittitur of all of the verdict in excess of $22,700.

*Quinn, Cuzzone & Geremia, John F. Cuzzone, Jr.,* for plaintiff.

*Carroll, Kelly & Murphy, Dennis S. Baluch, Eugene V. Higgins,* for defendant.