February 10, 2022

**Supreme Court**

No. 2019-297-Appeal.
(PC 17-2282)

Maureen Mowry                    :

v.                    :

Allstate Insurance Company.          :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Maureen Mowry          :

v.              :

Allstate Insurance Company.    :

Present: Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.**  The defendant, Allstate Insurance Company (Allstate), appeals from a judgment that was entered in favor of the plaintiff, Maureen Mowry, and that granted the plaintiff's motion for additur. This action arises out of a 2013 automobile accident, where the plaintiff received the policy limits of the tortfeasor's policy as compensation. She then filed a complaint against Allstate seeking underinsured motorist benefits. After a two-day trial, the jury awarded the plaintiff damages in the amount of $22,889.52. Subsequently, the trial justice granted the plaintiff's motion for a new trial and/or additur, wherein he granted the plaintiff an additur in the amount of $6,000.

This case came before the Supreme Court pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After considering the parties' written and oral submissions and reviewing the record, we conclude that cause has not been shown and that this case

- 1 -

may be decided without further briefing or argument. For the reasons set forth in this opinion, we affirm the Superior Court judgment.

# I

## Facts and Travel

On April 24, 2013, plaintiff was involved in an automobile accident (the 2013 automobile accident). The plaintiff testified at trial and alleged in her complaint that her vehicle was rear-ended by a car driven by Alex Velez and owned by Jacqueline Estacuy as she waited to make a left turn into her employer's parking lot in Norton, Massachusetts. As mentioned in Allstate's opening statement at trial, and according to plaintiff's complaint, she pursued a claim against Estacuy's insurance carrier, which paid plaintiff the limits under her policy. Because plaintiff believed that she was not fully compensated for the injuries she sustained from the 2013 automobile accident, she sought underinsured motorist benefits through her own insurer, Allstate.

The plaintiff filed a complaint against Allstate in Providence County Superior Court on May 17, 2017. A jury trial was held on March 6 and 7, 2019.

At trial, plaintiff testified that she currently works at Honeywell performing subassembly work. According to plaintiff, she was previously employed at Sinclair Manufacturing, where she had missed five and a half weeks of work as a result of the 2013 automobile accident. The plaintiff further explained that she had difficulty

upon her return to work at Sinclair Manufacturing in 2013 performing her normal job duties because her back "bothered" her and sometimes her "leg would give out." Additionally, plaintiff stated that she had trouble climbing stairs. The plaintiff testified that Sinclair Manufacturing terminated her employment in 2018. She contended that, on her last day, July 17, 2018, her neck, lower back, and leg were still bothering her. The plaintiff further testified that, after Sinclair Manufacturing let her go, she was unable to find new employment for approximately three months.

The plaintiff also testified at trial that, since the 2013 automobile accident, she has two or three headaches per day and is unable to "go running" and has problems "cleaning [her] house." On cross-examination, plaintiff acknowledged that her Sinclair Manufacturing job performance reviews in 2014 and 2015 did not indicate that she was compromised physically in her work.

The plaintiff testified that, immediately after the 2013 automobile accident, she had been taken by ambulance to Sturdy Memorial Hospital and was discharged from the hospital that same day. On cross-examination, plaintiff admitted that she was able to walk when she was released from the hospital on the day of the accident. The plaintiff did not seek further treatment for her injuries until approximately two weeks after the 2013 automobile accident. She testified that, at the direction of her attorney, she sought medical attention from David DiSanto, M.D., a neurosurgeon. The plaintiff testified that she saw Dr. DiSanto a total of three times from 2013 to

2019—once on April 30, 2013, another time on May 30, 2013, and a final time on January 16, 2019. The plaintiff stated that, at her May 30, 2013 appointment with Dr. DiSanto, he cleared her to return to work, which she did on June 3, 2013.

The plaintiff had also been involved in an automobile accident in 2011 (the 2011 automobile accident). Although plaintiff testified that she did not have to miss any time from work as a result of the 2011 automobile accident, on cross-examination plaintiff admitted to making a legal claim for lost wages at Sinclair Manufacturing through her attorney. The plaintiff confirmed that she was treated by Herbert Curtis, D.C., after the 2011 automobile accident for pain in her neck. The plaintiff testified that, after completing treatment with Dr. Curtis, her neck "was great" and "felt good." She also testified that she went to visit her primary-care physician, Barbara Jablow, M.D., for the injuries she sustained in the 2011 automobile accident.

The plaintiff testified that, after the 2013 automobile accident, she also sought chiropractic care from Gregory DeCrescenzo, D.C., for her injuries. When that treatment proved to be unsuccessful, plaintiff returned to Dr. Curtis. Unlike her prior successful treatment with Dr. Curtis in 2011, plaintiff testified, her 2013 course of treatment with Dr. Curtis was not successful because her neck and back continued to feel sore and she had a "tinglingness" in her legs. The plaintiff testified that she did not return to Dr. Curtis for treatment after August 2013.

Prior to that, during plaintiff's visit with Dr. DiSanto on April 30, 2013, Dr. DiSanto made a note indicating that plaintiff "denied any past medical history of any skeletal muscular injuries prior to this date." Doctor DiSanto testified at his deposition that, in layman's terms, this meant that plaintiff told him that, before the 2013 automobile accident on April 24, 2013, she had no prior injuries to her neck or back. The plaintiff also testified that she was not sure if she told Dr. DiSanto about the 2011 automobile accident.

On both direct and cross-examination, plaintiff discussed a "fall" she had in the shower in April 2016. The plaintiff stated that she "hit [her] shoulder[,]" which caused her to injure her neck again. The plaintiff testified that, after the 2016 fall in the shower, she went to see Kathleen O'Heelan, D.O.[1] The plaintiff at first did not recall, but later acknowledged, that she had both a "lumbar spine X-Ray" and a "cervical X-Ray" taken in April 2016. Additionally, plaintiff acknowledged, but did not recall, that an MRI had been performed on her neck in 2002, which showed a disc herniation at "C4-5 and C5-6[.]"

Moreover, plaintiff admitted that a report for her 2015 annual physical examination indicated that she did not mention experiencing neck or back problems. Likewise, plaintiff admitted the same with respect to her 2016 annual physical

---

[1] We note that there are inconsistencies between the transcript and the medical records as to the spelling of Dr. O'Heelan's last name. We utilize the spelling from the medical records provided as trial exhibits in Superior Court.

report, even though her physical was approximately eight days after her medical appointment for her fall in the shower. She further testified that the level of pain in her neck and back after her fall in the shower was a "ten out of ten" for approximately two weeks after the fall and that it was then a level of "six out of ten" for "a couple of more weeks." Similar to the 2015 and 2016 reports for her annual physical examinations, plaintiff acknowledged that the reports for her 2017 and 2018 annual physical examinations also did not indicate that she reported she had neck or back pain.

When plaintiff had her final appointment with Dr. DiSanto on January 16, 2019, she did not tell him about the fall in the shower because "he never asked [her]." Although plaintiff did not inform Dr. DiSanto about her 2016 fall in the shower, she testified that she told him she had ongoing neck and back pain. The plaintiff further acknowledged that, before the 2013 automobile accident, she had a diagnosis of osteoporosis and over the years had come to know that she has scoliosis and degenerative changes in her cervical and lumbar spine.

Doctor DiSanto, whose deposition was read before the jury, was the only expert witness who provided testimony. Doctor DiSanto testified that he conducted a review of plaintiff's MRI taken on May 17, 2013. He determined that plaintiff's C4-5 and C5-6 discs were protruding and "hitting the spinal cord[.]" He also indicated that there was a flattening of her spinal cord, or pressure on the spinal cord,

- 6 -

which can cause pain. Doctor DiSanto testified that, upon comparing plaintiff's 2011 MRI to her 2013 MRI, the former showed only that "she had an osteophyte and disc protrusion at C5-6[,]" whereas the 2013 MRI showed a C4-5 above the C5-6 and "some bulge of the disc at C5-6 and 6-7 level." Dr. DiSanto observed that the condition of plaintiff's cervical discs had worsened, and she had moderate narrowing of the spinal cord. Doctor DiSanto also testified that some of plaintiff's lumbar discs appeared to be abnormal.

Doctor DiSanto indicated that his visit note from April 2013, the first time plaintiff saw him, shows that his only medical treatment of plaintiff was the prescribing of medication, and he testified that, as of May 30, 2013, plaintiff was "neurologically healthy[.]" The doctor noted that, on May 30, 2013, she reported that she was "markedly better[,]" because he gave her muscle relaxants and two different types of pain medicines for her neck and back.

At his deposition, Dr. DiSanto acknowledged that, on May 30, 2013, plaintiff's pain level was a "[two] out of [ten] involving right sacroiliac joint in L4-L5 level[.]" He likewise acknowledged that he cleared plaintiff to return to work on June 3, 2013. Doctor DiSanto conceded that he was not aware of the injuries that plaintiff sustained before the 2013 automobile accident, namely those from the 2011 automobile accident, until "sometime in mid-January 2019[.]" He also admitted that

he did not refer plaintiff to physical therapy or chiropractic care and that he did not refer her to see any other doctor.

In addition, Dr. DiSanto testified that the injuries for which he treated plaintiff were "causally related" to the 2013 automobile accident. He stated that he was not aware of plaintiff's fall in the shower in 2016 until a few days before his deposition in February 2019. Doctor DiSanto testified that, when plaintiff last came to see him, on January 16, 2019, on a pain level of one-to-ten, with ten being the highest, plaintiff complained that her pain was at an eight. His January 16, 2019 report indicated that there were spasms at the L4-5 and C4-5 levels, and he testified that a muscle spasm was an objective symptom that could not be faked. Additionally, Dr. DiSanto opined that, even though it was not written down on his January 16, 2019 visit note, he would restrict plaintiff from repetitive lifting and bending, and that the injuries she sustained would cause her pain in the future. Doctor DiSanto also gave plaintiff a rating of "10 percent whole person impairment, 5 for the lower back and 5 for the neck[,]" based on the "AMA Guides to the Evaluation of Permanent Impairment, Volume VI."

Furthermore, Dr. DiSanto agreed that plaintiff had degenerative changes in her cervical and lumbar spine, which can take place gradually over a long period of time. He did, however, also opine that not everyone who has degenerative changes experiences pain; they can be asymptomatic. Moreover, Dr. DiSanto agreed that

- 8 -

trauma, such as an accident, could exacerbate a preexisting condition such as a degenerative change and could cause pain. In other words, Dr. DiSanto testified that an accident can aggravate a degenerative change that was not painful, and it could subsequently become painful. Doctor DiSanto acknowledged that Dr. Curtis's September 16, 2013 final report stated that plaintiff's cervical neck issues had resolved, but Dr. DiSanto noted that plaintiff's pain level was still a three out of ten.

Following the close of trial on March 7, 2019, the jury reached a verdict in favor of plaintiff, with the total damages awarded amounting to $22,889.52. The breakdown of the total amount of the verdict was (1) $12,409.52 for medical expenses; (2) $7,200 for pain and suffering up to the date of the trial; (3) zero damages for future pain and suffering; (4) zero damages for bodily injury and impairment; and (5) $3,480 for lost wages. Subsequently, plaintiff filed a motion for a new trial and/or additur, and Allstate filed an objection. A hearing on the motion was held on March 26, 2019, and the trial justice granted plaintiff an additur in the amount of $6,000. Final judgment was entered on April 25, 2019, and Allstate filed a timely notice of appeal on April 30, 2019.

## II

### Standard of Review

This Court has held that

> "a damage award may be disregarded by the trial justice
> and a new trial granted only if the award shocks the

- 9 -

conscience or indicates that the jury was influenced by passion or prejudice or if the award demonstrates that the jury proceeded from a clearly erroneous basis in assessing the fair amount of compensation to which a party is entitled." *Dilone v. Anchor Glass Container Corporation*, 755 A.2d 818, 820-21 (R.I. 2000) (quoting *Shayer v. Bohan*, 708 A.2d 158, 165 (R.I. 1998)).

The rule for either a motion for a new trial or a motion for additur "is substantially the same." *Pimental v. D'Allaire*, 114 R.I. 153, 157, 330 A.2d 62, 64 (1975).

A trial justice may grant an additur if he or she finds "a demonstrable disparity between the jury's verdict and the damages sustained [such] that an additur [is] required in order to make the verdict truly responsive to the merits of the controversy and to achieve substantial justice between the parties." *Silverio v. Sweetman*, 109 R.I. 527, 528, 288 A.2d 265, 265 (1972). This Court has held that "motions for additur, remittitur, or a new trial are to be reviewed by the trial justice from the p[er]spective of a seventh juror." *Hayhurst v. LaFlamme*, 441 A.2d 544, 547 (R.I. 1982). When a trial justice sits as a "super juror," he or she is required to "make an independent appraisal of the evidence in the light of his or her charge to the jury." *King v. Huntress, Inc.*, 94 A.3d 467, 481 (R.I. 2014) (brackets omitted) (quoting *Botelho v. Caster's Inc.*, 970 A.2d 541, 545 (R.I. 2009)).

Once the trial justice has "sift[ed] through the material evidence and pass[ed] on the credibility of the witnesses, the trial justice must then refer to those aspects of the case which have prompted his [or her] ruling." *Hayhurst*, 441 A.2d at 547. If

- 10 -

these conditions are satisfied, "this [C]ourt will accord great weight to the trial justice's determination concerning the adequacy of the jury's award." *Id.*; *see Roberts v. Kettelle*, 116 R.I. 283, 302, 356 A.2d 207, 219 (1976) (holding that, based on the trial justice's findings, the trial justice was not "clearly wrong in granting a new trial on the ground that the award was inadequate or that the additur of $10,000 represented an abuse of discretion").

### III

### Discussion

We begin by noting that Allstate is not contending that the amount of the additur was excessive or unreasonable; rather, Allstate is arguing that no additur should have been granted. As support for that argument, Allstate asserts that: (1) the trial justice was wrong to interfere with the jury's determination of damages because the verdict was not against the weight of the evidence, and was wrong in his finding that the damage award was not truly responsive and failed to provide substantial justice between the parties; and (2) Allstate's reference in opening arguments to plaintiff's settlement with the tortfeasor did not taint the jury.

### A

### Weight of the Evidence

Allstate argues that, in light of the "substantial evidence" it provided at trial refuting much of the testimony provided by Dr. DiSanto, the trial justice erroneously

granted the motion for additur "in the face of well-settled law." Allstate walks us through, somewhat extensively, the evidence presented at trial, as support for the jury's award of damages. In response, plaintiff asserts that the jury verdict did not respond to the merits of the case and failed to do substantial justice. To be sure, the trial justice's explication of his decision was not extensive. Nevertheless, we are satisfied that he undertook the appropriate analytical steps.

In deciding a motion for a new trial or additur, a trial justice

> "need not exhaustively analyze the evidence or state all of his conclusions regarding its weight or the witnesses' credibility, but he or she should, at the very least, refer sufficiently to what prompts his or her action in order to enable this [C]ourt to determine whether the trial justice's interference with the jury's verdict was based on a misconception of material evidence or was otherwise clearly wrong." *Kelaghan v. Roberts*, 433 A.2d 226, 229 (R.I. 1981).

"A trial justice need not 'categorically accept or reject each piece of evidence in his decision for this Court to uphold it because implicit in the trial justice's decision are sufficient findings of fact to support his rulings.'" *Notarantonio v. Notarantonio*, 941 A.2d 138, 147 (R.I. 2008) (quoting *Narragansett Electric Company v. Carbone*, 898 A.2d 87, 102 (R.I. 2006)).

Here, the trial justice first noted that he had given "a detailed set of jury instructions[,]" including various components addressing an award of damages. The jury had also been instructed to complete a verdict form setting forth a specific

amount for each such component. The trial justice remarked that the jury had awarded plaintiff nearly all that she had asked for in medical expenses, yet nothing for bodily injury and impairment. This was notwithstanding uncontradicted evidence at trial that plaintiff had "a five percent whole person impairment, a ten percent permanent partial."[2] We recognize that other potential conflicting medical evidence was presented by defendant; however, none of that evidence specifically refuted Dr. DiSanto's testimony on body impairment. The defendant offered evidence that called into question plaintiff's level of pain and whether plaintiff's current physical condition was even causally related to the 2013 automobile accident. Nevertheless, that evidence did not negate Dr. DiSanto's testimony regarding the disability and permanency findings. We have held that

> "failure to refer to other evidence contradictory to that on which the trial justice relied * * * does not constitute misconceiving or overlooking material evidence, if the trial justice refers to the evidence on which he did rely and in so doing clearly indicates that evidence to the contrary is rejected by him." *DiMaio v. Del Sesto*, 102 R.I. 116, 122, 228 A.2d 861, 864 (1967).

Therefore, in stating his reasons for granting the additur, the trial justice "implied the basis for his rejection of any contrary evidence which conflicted with his

---

[2] We note that the trial justice misstated Dr. DiSanto's disability and permanency findings. Doctor DiSanto's deposition testimony was that plaintiff had a "10 percent whole person impairment, 5 for the lower back and 5 for the neck."

findings[,]" and thus "properly performed his duty." *Pimental*, 114 R.I. at 159, 330 A.2d at 65.

Moreover, Dr. DiSanto's testimony explicitly stated that the injuries for which he treated plaintiff were causally related to the 2013 automobile accident. We also note that the trial justice seemed particularly troubled by the fact that the jury awarded zero damages for bodily injury and impairment.

Accordingly, we cannot say that the trial justice was clearly wrong in determining that the jury's award of damages did not truly respond to the merits of the case or that the additur of $6,000 was an abuse of discretion.

We are satisfied that the trial justice properly exercised his independent judgment in passing on the evidence and "neither overlooked nor misconceived any material evidence[,]" *Handy v. Geary*, 105 R.I. 419, 435, 252 A.2d 435, 443-44 (1969), and therefore we see no reason to doubt the trial justice's findings regarding the credibility of such evidence. From our review of the transcript and other evidence in the case, we conclude that "the evidence relating to [plaintiff's] injuries would reasonably warrant the granting of an additur[.]" *Colantonio v. Ellinwood*, 96 R.I. 226, 230, 190 A.2d 584, 587 (1963).

# B

## Reference to Settlement

The defendant also takes issue with a comment made by the trial justice in rendering his decision on plaintiff's motion for a new trial and/or additur that defendant in its opening statement had told the jury that plaintiff had received $25,000 in a settlement with the tortfeasor's insurance carrier. The trial justice then surmised:

> "The [c]ourt, after hearing the jury verdict, after looking at the case law, after looking at the motions, listening to the arguments of counsel, after reviewing the instructions, noting the zero for bodily injury and impairment, the [c]ourt wonders if that, perhaps, a Rule 408 would definitely keep that information from the jury, which is the rule of evidence that disallows or keeps out any evidence of settlement."

A review of the trial transcript reveals that defendant did not in fact mention the $25,000 figure; rather, defendant indicated during opening argument that plaintiff had received the insurance policy limits from the tortfeasor's insurer. Rule 408 of the Rhode Island Rules of Evidence states, in pertinent part, that:

> "Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. * * * This rule * * * does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue

- 15 -

delay, or proving an effort to obstruct a criminal investigation or prosecution."

We do not read Rule 408 as prohibiting the admission of "any evidence of settlement[,]" as the trial justice suggested. Instead, Rule 408 precludes the admission of evidence regarding settlements if the information is offered to prove liability for or invalidity of the claim or its amount.

In its statement submitted pursuant to Article I, Rule 12A of the Supreme Court Rules of Appellate Procedure, defendant argues that the trial justice's mistaken belief that the jury had improperly been told that plaintiff had previously recovered $25,000 "comprised the basis for the additur." In its supplemental statement, defendant elaborates, contending that the mere reference to the settlement did not taint the jury, because neither the amount of the settlement nor the tortfeasor's $25,000 policy limit was in fact disclosed to the jury. In addition, defendant notes that plaintiff's complaint alleges that the tortfeasor's "insurance carrier paid its policy limits to the [p]laintiff, but [p]laintiff was not fully compensated for her injuries."

Based upon our review of the evidence, we are convinced that the trial justice's ruminations concerning whether or not Rule 408 would have prevented the defendant from disclosing to the jury information about the settlement was nothing more than Monday morning quarterbacking. It is clear from the transcript that the trial justice credited the testimony of Dr. DiSanto that the plaintiff had suffered a

- 16 -

whole-person impairment, yet the jury awarded zero for bodily injury and impairment. We cannot say that the trial justice abused his discretion in granting an additur of $6,000.

## IV

## Conclusion

For the reasons set forth herein, we affirm the judgment of the Superior Court. The record may be returned to the Superior Court.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Maureen Mowry v. Allstate Insurance Company. |
| **Case Number** | No. 2019-297-Appeal.<br>(PC 17-2282) |
| **Date Opinion Filed** | February 10, 2022 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice William E. Carnes, Jr. |
| **Attorney(s) on Appeal** | For Plaintiff:<br><br>James T. McCormick, Esq.<br>Robert Testa, Esq. |
| | For Defendant:<br><br>Scott M. Carroll, Esq.<br>Connor J. Mills, Esq. |