# United States Court of Appeals
## For the First Circuit

No. 11-1026

DULCE DELGADO, as Administrator of The Estate of Jason
C.Goncalves; ROSA BERROA, as Mother and
Next Friend of J.X.G. and J.B.,

Plaintiffs, Appellants,

v.

PAWTUCKET POLICE DEPARTMENT; CITY OF PAWTUCKET, by and through
its Finance Director Ronald Wunschel; RICHARD LAFOREST, in
his individual capacity and official capacity; CHRISTOPHER R.
LOMBARDI, in his individual capacity and official capacity;
GEORGE L. KELLEY, in his official capacity,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before
Boudin, Howard and Thompson,
Circuit Judges.

Jeffrey D. Sowa, with whom Michael J. Jacobs and LaPlante Sowa
Goldman were on brief, for appellants.
Marc DeSisto, with whom DeSisto Law was on brief, for
appellees.

February 9, 2012

**HOWARD**, **Circuit Judge**.  This is a state law tort action over which the district court retained supplemental jurisdiction after dismissing the plaintiffs' federal claims.  The matter went to trial, but at the close of the plaintiffs' case in chief, the district court granted a defense motion for judgment as a matter of law.  See Fed. R. Civ. P. 50(a)(1).  The plaintiffs appeal, protesting the court's exercise of supplemental jurisdiction, the preclusion of certain testimony, and the granting of the Rule 50 motion.  Discerning no error, we affirm.

## I.  BACKGROUND

Plaintiffs-appellants are the administrator of the estate and the surviving children of Jason C. Goncalves, who was killed in an automobile accident that resulted when Josimar Pereira, the driver of a vehicle in which Goncalves was a passenger, attempted to flee Pawtucket, Rhode Island police officers.  Asserting federal constitutional and state tort claims arising out of this incident, the plaintiffs filed suit in Rhode Island state court against the officers, the City of Pawtucket, the Pawtucket Police Department ("PPD"), and the city's police chief in his official capacity.  The defendants removed to federal court pursuant to 28 U.S.C. § 1331.  Subsequently, the district court granted the defendants' motion for summary judgment in part, dismissing the plaintiffs' constitutional claims.  The court denied the plaintiffs' motion to remand the

remaining state law tort claims against the individual officers, and the matter went to trial.

During their case in chief, the plaintiffs sought to establish that the officers were reckless (1) in their decision to initiate and continue their pursuit of Pereira and (2) in failing to comply with PPD policy concerning high-speed pursuits.[1]

As to the first claim, Officers Christopher Lombardi and Richard LaForest testified that on the Friday afternoon of August 12, 2005, they were patrolling a section of Pawtucket in a marked police cruiser. Lombardi was driving. During their patrol, the officers received a radio dispatch advising them to be on the lookout for a suspect in two recent armed robberies in nearby Providence. The broadcast provided a physical description of the suspect and his vehicle, a teal, four-door sedan with a temporary license plate in the rear window.

When shortly thereafter the officers caught sight of an automobile matching this description, they sought to get a look at the vehicle's driver. As Lombardi conducted a three-point turn to be able to do so, however, the car sped away. It accelerated to the end of the street, turned onto a crossroad without stopping at a stop sign, and proceeded to pass other vehicles by straddling the yellow lines separating the oncoming traffic lane.

---

[1]A negligence claim was dismissed by agreement of the parties.

The officers testified that, with their suspicion seemingly confirmed by this behavior, they activated the cruiser's lights and siren and attempted to catch up to the vehicle. The suspect sped through the rush hour traffic of downtown Pawtucket at varying speeds of up to sixty to seventy miles per hour, disobeying traffic signals in the process. The officers testified that although they, too, exceeded the posted speed limit of twenty-five miles per hour, sometimes by at least fifteen miles per hour, they stopped or slowed down at every intersection. As a result, they testified, they were unable to get within 400 feet of the vehicle and even lost sight of it for thirty seconds of the pursuit.

After approximately two minutes had elapsed and 1.4 miles had been covered, and with the officers trailing 800 to 1,000 feet behind, the driver of the teal vehicle ran a red light at high speed and collided with another car in the intersection. The occupants of the teal vehicle were thrown from the vehicle upon impact. It was not until Lombardi and LaForest reached the scene of the accident and saw the vehicle's occupants for the first time that they realized that neither the driver, Josimar Pereira, nor the passenger, Jason C. Goncalves, matched the physical description of the robbery suspect given in the radio dispatch.

The plaintiffs hoped to cast doubt upon this version of events with the testimony of Pereira, who, they claimed, would testify that the officers were within two car lengths of his

vehicle for the entirety of the chase. The plaintiffs sought to admit Pereira's testimony in deposition form, arguing that because he was imprisoned at the time of trial, Federal Rule of Civil Procedure 32(a)(4)(C) permitted admission of his deposition in lieu of live testimony.[2] When the district court rejected the plaintiffs' contention that Pereira was "unavailable" within the meaning of the rule notwithstanding that he could be made to appear for live testimony, the plaintiffs moved for a continuance to secure his presence. Noting that the issue had been previously discussed during the course of pre-trial proceedings, the district court denied this request. As a result, the officers' account of the chase itself remained uncontroverted.

Testimony relating to whether departmental pursuit policies were followed was, however, somewhat less one-sided. The Pawtucket Police Manual of Procedures describes the circumstances under which officers may engage in a high speed pursuit -- defined as a pursuit in excess of fifteen miles per hour over the posted speed limit -- and imposes procedures to be followed in the event that such a pursuit is undertaken. The plaintiffs probed whether the officers complied with two of those requirements, in particular.

---

[2]Rule 32(a)(4)(C) provides that "[a] party may use for any purpose the deposition of a witness, whether or not a party, if the court finds . . . that the witness cannot attend or testify because of age, illness, infirmity, or imprisonment." Fed. R. Civ. P. 32(a)(4)(C).

The first is the requirement that responding officers and their shift supervisors assess the value of apprehending the fleeing operator in relation to the potential dangers of doing so, to ensure that a pursuit is justified in its inception and continuation.[3] The policy lists several factors to consider when conducting that assessment, including the amount of vehicular and pedestrian traffic, location, weather conditions, road surface conditions, time of day, the officers' knowledge of the road and surrounding area, the performance capabilities of the pursuit vehicle and the vehicle being pursued, and any other potentially hazardous conditions known to the officer. When questioned by the plaintiffs about whether he had taken these factors into account in deciding to initiate and continue the pursuit, LaForest admitted that he had not. Lombardi, who was driving the cruiser, stated that he was aware of the factors. He, however, was not asked whether he had considered them.

---

[3]For completeness, we note that the policy prohibits high speed pursuits except in situations involving the attempted apprehension of persons wanted for the commission of offenses that threaten the safety of others or the pursuit of a driver who "has committed moving motor vehicle violations which have endangered the lives and safety of others, and was operating in a reckless manner before the pursuit was initiated, and is continuing to operate in a manner that recklessly endangers the lives and safety of others . . . ." The evidence indicates, and the plaintiffs do not deny, that at least one of these conditions was satisfied in this case. The decision to pursue Pereira thus fell within the discretion of the acting officers and their supervisor, circumscribed by the considerations noted above.

The second relevant policy requirement, aimed at supervisor oversight, calls for officers to notify the dispatcher as soon as is practicable that a pursuit has commenced, and to provide ongoing updates about location, speed, and attendant circumstances as the pursuit unfolds. The officers testified that LaForest notified dispatch of the pursuit as soon as the cruiser lights and siren were activated and provided updates every ten to fifteen seconds thereafter. This account was called into question, however, by the testimony of Lieutenant Daniel Mullen, the supervising officer at the time of the event (who monitored the radio transmissions from his cruiser), and Robert Langlois, Jr., the police dispatcher. Both Mullen and Langlois recalled receiving only two radio transmissions: the initial call and notification of the accident only seconds later. Mullen indicated that the time that elapsed between the transmissions was of such short duration that he had no opportunity to assume control of the pursuit. Langlois noted that there was a second dispatcher, but that he himself responded by radio only twice.

Without more, the plaintiffs rested. As they did so, they voluntarily dismissed their negligence claim[4] and the

_____

[4]Under Rhode Island law, the driver of an authorized emergency vehicle engaged in the pursuit of an alleged violator of the law is subject to liability only for his reckless disregard for the safety of others, not for mere negligence, provided the driver gives an audible warning signal while in motion. See R.I. Gen. Laws §§ 31-12-6, 31-12-8, 21-12-9; see also Medeiros v. Town of South Kingstown, 821 F. Supp. 823, 828 n.1 (D.R.I. 1993). Prior to

defendants moved for judgment as a matter of law on the sole remaining claim of recklessness. The defendants asserted that the evidence did not support a finding that the officers' conduct in initiating and carrying out the chase evinced a reckless disregard for the safety of others, while the plaintiffs focused their response on the theory that the evidence established a violation of the Pawtucket pursuit policy, which they claimed constituted evidence of recklessness sufficient to submit the case to a jury. The defendants contested not only these assertions but also the underlying assumption that the pursuit policy applied at all.

The district court granted the Rule 50(a) motion. Without definitively determining whether the officers had been engaged in a "pursuit" such that the departmental pursuit policy applied, the court concluded that no reasonable jury could find that the officers had acted with reckless disregard for the safety of others notwithstanding any violation of the policy. This timely appeal ensued.

---

trial, there was some question about whether the defendants qualified for this protection in light of deposition testimony in which Pereira insisted that the defendants' lights and sirens were never activated. Although this testimony contradicted an earlier interview statement in which Pereira had indicated that the cruiser's lights and siren were on when the defendants pursued him, it was deemed sufficient to create a material factual dispute to overcome summary judgment. With the preclusion of Pereira's testimony at trial, however, the officers' testimony that their siren was activated remained uncontroverted. Any doubts as to the applicable standard of care were therefore resolved in favor of a recklessness standard, and the plaintiffs voluntarily relinquished their negligence claim.

## II. ANALYSIS

On appeal, the plaintiffs challenge the district court's denial of their motion to remand the action to state court, the preclusion of Pereira's testimony, and the climactic grant of the defendants' motion for judgment as a matter of law. We address these points in turn.

### A. Supplemental Jurisdiction

The plaintiffs first argue that the district court should not have retained jurisdiction over this matter once the federal claims were decided against them on summary judgment. They assert that we should review the district court's denial of their motion to remand de novo and conclude that the district court erred. Neither the standard of review nor the result is warranted.

To be sure, there are instances in which we review a district court's denial of a motion to remand de novo, such as when the motion challenges the existence of a federal claim upon which federal jurisdiction is predicated. See BIW Deceived v. Local S6, Indus. Union of Marine and Shipbuilding Workers of America, IAMAW Dist. Lodge 4, 132 F.3d 824, 830 (1st Cir. 1997). Once a case is properly before a federal district court, however, that court has broad authority to retain jurisdiction over pendant state law claims even if the federal claim is later dismissed. Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 256-57 (1st Cir. 1996) ("In a federal-question case, the termination of the foundational

federal claim does not divest the district court of power to exercise supplemental jurisdiction but, rather, sets the stage for an exercise of the court's informed discretion.") (citing 28 U.S.C. § 1367(c)(3) (authorizing but not requiring a district court to decline adjudication of lingering state-law claims after it has dismissed "all claims over which it has original jurisdiction")). In determining whether to retain jurisdiction on such an occasion, the court must take into account considerations of judicial economy, convenience, fairness to the litigants, and comity.  Id. at 257.  In the end, though, its decision is a "pragmatic and case-specific" one that we review only for abuse of discretion.  Id.

The district court's decision here to retain jurisdiction over the plaintiffs' state law claims after dismissing the federal claims fell squarely within the realm of its discretion.  At the time of the plaintiffs' motion to remand, the case had passed through every phase of litigation but trial.  Moreover, the court had already determined many substantial questions of state law at summary judgment.  Under such circumstances, the interests of judicial economy and fairness weighed in favor of retaining jurisdiction.  We therefore conclude that the district court appropriately exercised its discretion.

## B.  Precluded Testimony

The plaintiffs next take issue with rulings by the district court that prevented them from admitting the testimony of

Josimar Pereira.  They argue that the district court erred first in denying use of Pereira's deposition testimony under Federal Rule of Civil Procedure 32(a)(4)(C) and then in refusing to grant a continuance to secure Pereira's live testimony.  We disagree on both counts.

### 1.  Deposition testimony

Rule 32(a)(4)(C) allows for the admission of a witness's deposition testimony in lieu of live testimony where "the court finds . . . that the witness cannot attend or testify because of age, illness, infirmity, or imprisonment."  Fed. R. Civ. P. 32(a)(4)(C).  There is no dispute that although Pereira was imprisoned, he could have been made available to testify at trial by means of a writ of habeas corpus ad testificandum.  The plaintiffs nonetheless sought to admit Mr. Pereira's deposition, contending that Pereira's imprisonment rendered him ipso facto "unavailable" within the meaning of the rule.

While ordinarily we review a district court's refusal to admit deposition testimony for abuse of discretion, Daigle v. Maine Medical Center, Inc., 14 F.3d 684, 691 (1st Cir. 1994), the parties' disagreement here centers not on the application of Rule 32(a)(4)(C) but on its interpretation.  In such circumstances, de novo review is appropriate.  In re Pharm. Indus. Average Wholesale Price Litig., 588 F.3d 24, 38 (1st Cir. 2009) (citing NEPSK, Inc. v. Town of Houlton, 282 F.3d 1, 5 (1st Cir. 2002)).

-11-

In interpreting a formal rule of procedure, our starting point is the language of the rule itself. Downy v. Bob's Disc. Furniture Holdings, Inc., 633 F.3d 1, 6 (1st Cir. 2011) (citations omitted). We interpret this language with due regard to its ordinary meaning and the context in which it is found. In re Pharm. Indus. Average Wholesale Price Litig., 588 F.3d at 39 (citations omitted).

A plain, common sense reading of Rule 32(a)(4)(C) illustrates the weakness in the plaintiffs' position. The rule requires as a prerequisite to the admission of deposition testimony that the court find "that the witness cannot attend or testify because of" one of the enumerated conditions. Fed. R. Civ. P. 32(a)(4)(C) (emphasis added). By its terms, then, the rule does not permit the use of deposition testimony where the age, illness, infirmity, or imprisonment of a witness provides no basis to conclude that the witness is unable to provide live testimony. Moreover, this reading makes sense as a practical matter. It would be startling to suggest that deposition testimony should be substituted, based on nothing more than merely citing a witness's age or asserting that a witness was ill, without establishing why age or illness presented a genuine barrier to live testimony. Similarly, a credible claim cannot be made that Mr. Pereira should be excused from testifying in person without establishing that his imprisonment prevents him from doing so.

Contrary to the plaintiffs' suggestion, another section, 32(a)(4)(B), supports rather than undermines this conclusion. Rule 32(a)(4)(B) allows admission of deposition testimony where "the witness is more than 100 miles from the place of hearing or trial . . . ." Fed. R. Civ. P. 32(a)(4)(B). We have held that so long as this distance criterion is satisfied, "the admissibility of deposition testimony under the aegis of Rule [32(a)(4)(B)] is not contingent upon a showing that the witness is otherwise unavailable." Daigle, 14 F.3d at 691. Critically, however, Rule 32(a)(4)(B) does not contain the requirement that the court find "that the witness cannot attend or testify because of" distance. Compare Fed. R. Civ. P. 32(a)(4)(C), with Fed. R. Civ. P. 32(a)(4)(B). One therefore cannot simply graft our interpretation of Rule 32(a)(4)(B) onto Rule (a)(4)(C); indeed, in order to give any effect at all to the difference in the construction of these two provisions, we must reject the plaintiffs' attempt to do so. Cf. United States v. Menasche, 348 U.S. 528, 538-39 (1955) ("It is our duty to give effect, if possible, to every clause and word of a statute . . . .") (quotation omitted).

In sum, the district court was correct to reject the plaintiffs' construction of Federal Rule of Civil Procedure 32(a)(4)(C) and to refuse to admit Mr. Pereira's deposition where it had found that he was, in fact, available for live testimony.

### 2. Motion to continue

The plaintiffs argue that even if Pereira was not "unavailable" for the purposes of Federal Rule of Civil Procedure 32(a)(4)(C), the district court should have granted their request for a continuance so they could procure Pereira's live testimony through a writ of habeas corpus ad testificandum. They characterize their request as "for a continuance of roughly an hour," noting that they made the request around 3:00 p.m., and the court was scheduled to recess at 4:00 p.m. They further emphasize that because the jury was set to return the following morning to deliberate, the continuance would not have resulted in keeping the jury empaneled for an additional day.

District courts enjoy broad discretion in managing their dockets, and we review a denial of a motion for a continuance for abuse of that discretion only. Macaulay v. Anas, 321 F.3d 45, 49 (1st Cir. 2003). In conducting this review, we "look[] primarily to the persuasiveness of the trial court's reasons for refusing the continuance and give[] due regard not only to the factors which inform that court's ruling but also to its superior point of vantage." United States v. Ottens, 74 F.3d 357, 360 (1st Cir. 1996). The burden is on the aggrieved party to demonstrate that in refusing the continuance, the district court "exhibited an 'unreasonable and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay.'" United States v.

-14-

Rodríguez-Durán, 507 F.3d 749, 763 (1st Cir. 2007) (quoting United States v. Rodriquez-Marrero, 390 F.3d 1, 21-22 (1st Cir. 2004)).

The plaintiffs have not met this high burden. The record indicates that opposing counsel had made known its objection to the admission of Pereira's deposition testimony and the issue was discussed at the final pre-trial conference. Although the record does not disclose the content of those discussions, this much is known: they prompted the plaintiffs to speak to legal counsel at the correctional institute at which Pereira was imprisoned to determine whether Pereira could be made to appear by means of a writ of habeas corpus ad testificandum. Despite confirming that this was indeed a possibility, the plaintiffs opted not to pursue it, choosing instead to rely on their proposed interpretation of Rule 32(a)(4)(C). Moreover, they did so notwithstanding that they had ample opportunity prior to trial to resolve the issue and, if necessary, to obtain a court order to secure Pereira's presence. We see no abuse of discretion in the district court's decision to deny the plaintiffs' mid-trial request for a continuance to remedy the foreseeable and easily avoidable predicament that resulted when they lost their gamble. See United States v. Saccoccia, 58 F.3d 754, 770 (1st Cir. 1995) ("[R]elevant factors [in our analysis] may include such things as . . . the extent to which the movant has contributed to his perceived predicament . . . .").

## C. Judgment as a Matter of Law

The plaintiffs' last assignment of error concerns the entry of judgment as a matter of law. We review such dispositions de novo, based on an examination of the evidence and inferences reasonably drawn therefrom in the light most hospitable to the nonmoving party. Fashion House, Inc. v. K mart Corp., 892 F.2d 1076, 1088 (1st Cir. 1989) (citing Wagenmann v. Adams, 829 F.2d 196, 200 (1st Cir. 1987)). In conducting this review we do not pass upon the credibility of witnesses, resolve evidentiary conflicts, or evaluate the weight of the evidence. Id. (citing Wagenmann, 829 F.2d at 200). Withdrawing a claim from the jury is appropriate only if the evidence, viewed from this perspective, compels a result as to which reasonable minds could not differ. Id.

Where, as here, a federal court exercises supplemental jurisdiction over a state law claim, state law supplies the rule of decision. Hoyos v. Telecorp Commc'ns, Inc., 488 F.3d 1, 5 (1st Cir. 2007). To recover under Rhode Island law, the plaintiffs bore the burden of demonstrating by a preponderance of the evidence the standard elements of a tort claim: "a legally cognizable duty owed by a defendant to a plaintiff, a breach of that duty, proximate causation between the conduct and the resulting injury, and the actual loss or damage." Olshansky v. Rehrig Intern., 872 A.2d 282, 289 (R.I. 2005). Inasmuch as the defendants were alleged to have

been engaged in the pursuit of an alleged violator of the law and activated their lights and siren during the pursuit, they can be held liable in tort only if their conduct constituted a reckless disregard for the safety of others. See R.I. Gen. Laws §§ 31-12-6, 31-12-8, 31-12-9. In other words, the plaintiffs were required to prove that the defendants conducted themselves "in such a manner as to demonstrate a heedless indifference to the consequences of [their] action." Roberts v. Kettelle, 356 A.2d 207, 213 (R.I. 1976).

The district court concluded that no reasonable jury could find that the plaintiffs had satisfied this burden. Highlighting uncontradicted testimony that the officers stopped or slowed down at every intersection, and never closed within 400 feet of Pereira's vehicle, the court found that the evidence compelled the conclusion that they did not exhibit reckless disregard for the safety of others in balancing their simultaneous duties to investigate the vehicle matching the description in the radio broadcast and to avoid undue risk of harm to innocent bystanders in the process.

On appeal, as at the close of evidence in the district court, the plaintiffs' challenge rests primarily on alleged violations of the PPD's pursuit policy. The plaintiffs assert that (1) under Rhode Island law, a pursuit policy violation is evidence of recklessness sufficient to submit the question of breach of a

duty of care to a jury, and (2) the evidence presented at trial could support a jury finding that the officers violated their department's pursuit policy by failing to consider the various factors required to assess the dangerousness of the pursuit relative to the potential advantage of apprehending the suspect and by failing to notify their shift lieutenant of the pursuit as soon as practicable.[5]  The argument fails.

The plaintiffs rely on Seide v. State, 875 A.2d 1259 (R.I. 2005), in which the Rhode Island Supreme Court vacated a judgment granted as a matter of law in favor of police officers who had engaged in a lengthy and dangerous high-speed chase of a fleeing car thief that resulted in the death of an innocent bystander.  In Seide, testimony established that the officers pursued the thief – who prior to the officers' intervention had driven safely and within the speed limit – for more than thirty minutes as he "disregarded traffic signals, drove through downtown Providence erratically, swerved at police cruisers, struck objects, repeatedly exited and reentered major highways, reached speeds of

---

[5]The second of these alleged violations is predicated upon the testimony of the shift lieutenant and dispatcher.  The plaintiffs claim that if the jury were instead to credit the officers' testimony that they called in the pursuit immediately upon activating the cruiser's lights and siren and provided continual updates throughout the chase, a second violation of the pursuit policy would have still occurred based on the shift lieutenant's failure to appreciate the danger of the pursuit and call it off. But what the plaintiffs allege under the alternative scenario is a policy violation by a third party to the case, not recklessness on the part of the individual defendants.

approximately ninety miles per hour, and endangered the safety of the police officers and the driving public."  Id. at 1269.

The court held, inter alia, that this evidence could reasonably lead to the conclusion that the officers' failure to terminate the chase sooner despite the obvious risks that it posed was in reckless disregard for the safety of others.  Id.  Noting that the plaintiff had also alleged that the defendants were reckless by virtue of their failure to comply with their department's pursuit policy, the court, without further elaboration, briefly indicated that a violation of a pursuit policy "could serve as evidence" of recklessness.  Id. at 1272 (emphasis added).  It is this last statement which serves as the foundation of the plaintiffs' appeal in this case.

Seide, however, is not as definitive as the plaintiffs claim.  To begin, the court quite understandably did not say that any violation of a pursuit policy necessarily constitutes evidence of recklessness, regardless of how remote the connection between the purported violation and the alleged risk.  Although the court sensibly observed that a pursuit policy may serve as a standard against which a jury could measure officer conduct, the specific holding in Seide was limited to the determination that the violation of the policies at issue in that case could serve as evidence of recklessness.  Id.  That is not the same as saying that any pursuit policy violation creates an issue for the jury.

-19-

A violation of the requirement to engage in a particular decisional calculus or to notify and update the dispatch center of the status of the pursuit does not necessarily equate to recklessness. And, in any event, the plaintiffs' evidence of the former violation was starkly deficient: although Officer LaForest acknowledged that he did not consider the relevant factors, the driver, Officer Lombardi, was never asked whether he considered them.

In the main, pursuit policies are designed to guide officers, not to create an independent source of liability. See, e.g., Courville on Behalf of Vincent v. City of Lake Charles, 720 So.2d 789, 799 (La. Ct. App. 1998) ("We find that a violation of [departmental pursuit] policies is not negligence per se."); Norris v. Zambito, 520 S.E.2d 113, 118 (N.C. Ct. App. 1999) ("A violation of voluntarily adopted safety policies is merely some evidence of negligence and does not conclusively establish negligence.") (citations omitted); Saarinen v. Kerr, 84 N.Y.2d 494, 503 n.3 (1994) ("A violation of this policy, if in fact it occurred, would be an important, although not dispositive, factor in determining whether [the defendant] had acted recklessly."). The ultimate issue, in other words, is not lack of compliance with pursuit policies, but recklessness.

While the plaintiffs peg their showing of recklessness mostly on the mere existence of alleged policy violations, they

also argue -- albeit in lackluster and conclusory fashion -- that, regardless of the department's policies, the officers' decision to continue the pursuit was reckless conduct in light of the attendant circumstances.  This argument cuts closer to the substantive heart of the issue, and while the plaintiffs' presentation of the claim risked forfeiture, we consider it separately on the merits.

The gist of the matter is this: that for the police to chase a suspect for a considerable period at very high speed, trying to box him in and bring him to a halt with hastily erected roadblocks surrounded by innocent drivers as the suspect travels the wrong way on a divided highway, does present a jury issue as to recklessness, see Seide, 875 A.2d at 1264; but the present case is quite different and does not.  By the police account (which was the only version available to the jury):

> -the entire episode lasted only about two minutes, giving the officers a limited period to assess the situation, their options and the best course among various alternatives (break off, tail for a period, speed up and intercept);

> -the officers were not themselves driving dangerously for they had their lights and sirens activated throughout the pursuit and they drove at a moderate speed and slowed or stopped at each intersection, which necessarily created a significant distance between their car and Pereira's throughout the chase;

> -the fleeing car was perceived  to be associated with two armed robberies  and the

-21-

> high speed flight tended to confirm the
> likelihood that the driver and perhaps anyone
> else in the car was associated with a serious
> crime and posed a continuing danger to the
> community;

In substance, the police did little more than attempt for a couple of minutes to keep a fleeing car in sight, making no effort physically to intercept and halt it.  To call this "reckless" would be to extend the label -- a demanding standard, e.g., Roberts, 365 A.2d at 213-14 -- far beyond Seide.  And while it might have been better practice to reserve judgment on the issue and let the jury return its verdict, see Fed. R. Civ. P. 50(b), which would almost certainly have mooted the issue and also avoided the possibility of a retrial in the event of a successful appeal, we cannot fault the district court for its ultimate decision that no reasonable jury could side with the plaintiffs.

Based on Seide, the Rhode Island Supreme Court does not share the apparent view, joined by eight Justices in Scott v. Harris, that it is almost never unreasonable for the police to decline to break off a chase because that would give any fleeing suspect a ticket to immunity.  550 U.S. 372, 385-86 (2007).  Rhode Island is entitled to use its own standard and a federal court must respect that standard in ruling on state law claims.  But that standard is surely not infinitely elastic and we think that it cannot stretch to the circumstances of this case.

The case is quite unusual, for ordinarily there is more than one factual description of what happened, and the version presented by the plaintiff is generally more favorable to his case. The choice between those versions is almost always for the jury. But in this case, only the defense version was available.

We need go no further. Absent sufficient evidence on the issue of breach, the jury had no legally cognizable basis for finding the officers liable for Goncalves's death. It follows inexorably that there was no error in the allowance of the defendants' motion for judgment as a matter of law.

## III.  CONCLUSION

For the aforementioned reasons, we **<u>affirm</u>** the district court in all respects.