# United States Court of Appeals
## For the First Circuit

No. 11-1931

BOSTON GAS COMPANY, d/b/a National Grid,

Plaintiff, Appellant,

v.

CENTURY INDEMNITY COMPANY,

Defendant/Third-Party Plaintiff, Appellee.

CERTAIN UNDERWRITERS AT LLOYD'S LONDON;
CERTAIN LONDON MARKET INSURANCE COMPANIES;
TRAVELERS CASUALTY AND SURETY COMPANY,
f/k/a Aetna Casualty & Surety Company;
ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED;
THE HARTFORD INSURANCE COMPANY,

Third-Party Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Torruella, Lipez and Howard,
Circuit Judges.

David L. Elkind, with whom John A. Gibbons and Dickstein
Shapiro LLP were on brief, for appellant.
Guy A. Cellucci, with whom Shane R. Heskin, David B. Chaffin
and White and Williams LLP were on brief, for appellees.

January 18, 2013

**HOWARD**, **Circuit Judge**.  This appeal is the latest chapter in a long-running dispute between Boston Gas Company ("Boston Gas") and one of its insurers, Century Indemnity Company ("Century"). What's more, the insured's activities giving rise to the dispute stretch back more than a century.  During the latter part of the 19th and well into the 20th century, Boston Gas produced gas fuel at facilities known as manufactured gas plants ("MGPs").  Faced with liability under Massachusetts law for the costs of investigating and remediating environmental contamination discovered at a number of former MGP sites, see Mass. Gen. Laws ch. 21E (2006), Boston Gas filed this diversity action seeking a declaratory judgment as to Century's obligations under general commercial insurance ("GCL") policies issued to Boston Gas by Century's predecessor and damages for breach thereof.  As relevant to this appeal, jury trials have been held with respect to two of the sites included in the cleanup, the Everett and Commercial Point sites.  Boston Gas operated MGPs at the Everett and Commercial Point sites during the periods 1908-1969 and 1886-1930, respectively, and insured both sites with Century from 1951-1969.

The Everett site litigation was the first to go to trial. The jury awarded Boston Gas over $6.1 million in past remediation expenses, and the district court issued a declaratory judgment obligating Century to pay all future costs associated with the cleanup of the site.  On appeal, a central issue involved the

-3-

proper method under Massachusetts law for allocating liability for long-term environmental contamination where the defendant GCL insurer had provided coverage for the risk for only a portion of the time during which the contamination took place. Based on an existing intermediate state court decision, the district court had applied an "all sums" or "joint and several" allocation method, whereby an insurer is responsible for an insured's total remediation costs as long as some property damage for which the insured is liable occurs during the policy period. Noting that the Commonwealth's highest court had not yet ruled on the issue, which was "determinative of the scope of Boston Gas' claim," a panel of this court certified the allocation question to the Supreme Judicial Court ("SJC"). Boston Gas Co. v. Century Indem. Co., 529 F.3d 8, 23-24 (1st Cir. 2008).

The SJC rejected an "all sums" approach in favor of pro rata allocation, pursuant to which each insurer is obligated to pay only those costs associated with damage occurring during its policy period. See Boston Gas Co. v. Century Indem. Co., 910 N.E.2d 290, 312 (Mass. 2009). The court held that the preferred method for allocating damages on a pro rata basis is a "fact-based" determination of the losses occurring during each policy period, but in the event that the evidence does not permit such an allocation, losses should be allocated based on the insurer's "time on the risk." Id. at 316. Under the time-on-the-risk method,

-4-

"each triggered policy bears a share of the total damages [up to its policy limit] proportionate to the number of years it was on the risk [the numerator], relative to the total number of years of triggered coverage [the denominator]." Id. at 313 (quoting 23 E.M. Holmes, Appleman on Insurance § 145.4[A][2][b], at 24 (2d ed. 2003)).  "Given the factual complexities of cases of this sort," the SJC explained, "we defer to trial judges in the first instance to determine whether losses can be allocated based on the amount of property damage that in fact occurred during each policy period, or must instead be allocated on the basis of each insurer's time on the risk."  Id. at 316.

Upon receipt of this guidance, we remanded to the district court to determine in the first instance "how far [the jury verdict] serve[d] as a predicate for employing the pro rata approach adopted by the SJC," and for further proceedings as necessary.  Boston Gas Co. v. Century Indem. Co., 588 F.3d 20, 23 (1st Cir. 2009).  The presiding trial judge found that the jury verdict could not support a pro rata allocation, thus necessitating a new trial.  Pursuant to local rule, the global action was reassigned to a different judge.  See D. Mass. R. 40.1(K)(1). Thereafter, the parties reached a settlement regarding the Everett site costs.

Meanwhile, the Commercial Point litigation, which is the subject of the present appeal, had proceeded to trial prior to the

SJC's ruling on allocation. At the conclusion of the nine-day trial, the jury returned a special verdict finding that property damage resulting in liability occurred during each of the eighteen years of the Century policies. The verdict form also required the jury to make findings regarding the applicability of two potential policy exclusions: the "expected/intended" exclusion, which excluded coverage for damage caused knowingly or intentionally, and the "owned property" exclusion, which barred coverage for costs incurred solely to remediate the insured's own (as opposed to third party) property. The jury found that the owned property exclusion applied to one portion of the site (the "Keyspan upland" area), but found the expected/intended exclusion inapplicable. Asked to indicate "the amount Boston Gas Company . . . has been legally obligated to pay for the investigation and/or remediation as a result of property damage at the Commercial Point site for which coverage was not excluded," the jury responded with the amount of $1,699,145.79.

The trial judge deferred ruling on post-trial motions and entry of final judgment pending the outcome of the Everett appeal. Those motions now having been resolved, and entry of judgment in the Commercial Point litigation stipulated to, Boston Gas appeals on multiple grounds. For the reasons set forth below, we affirm in all respects.

**Allocation**

In the wake of the SJC ruling, Century moved for entry of judgment in its favor on the issue of allocation or, in the alternative, for a new trial on the timing and allocation of property damage. It argued that Boston Gas should be bound, under the doctrine of judicial estoppel, by its representations at trial that property damage had occurred continuously from the beginning of plant operations until the date of remediation. Century accordingly requested that the district court allocate damages evenly from 1886 through 2007 based on the time-on-the-risk method announced by the SJC. Boston Gas rejoined that the jury verdict already reflected a fact-based allocation and that judgment should be entered on that basis, viz., that all covered damages at the site occurred during Century's policy periods.

The district court rejected Boston Gas's view of the verdict and, concluding that the evidence did not permit a fact-based allocation and that Boston Gas was judicially estopped from contradicting its prior statements that contamination was continuous, allocated damages evenly across the 121-year span. In light of Century's time on the risk, this had the effect of reducing its share of damages from 100 percent to less than 15 percent. Our review of each of these rulings is for abuse of discretion. See Jennings v. Jones, 587 F.3d 430, 436-37 (1st Cir. 2009) (sustainability of jury verdict); Boston Gas, 910 N.E.2d at

-7-

316 (election of pro rata allocation method); <u>Rockwood</u> v. <u>SKF USA Inc.</u>, 687 F.3d 1 (1st Cir. 2012) (judicial estoppel); <u>see also</u> <u>Guay</u> v. <u>Burak</u>, 677 F.3d 10, 16 (1st Cir. 2012) ("Under the abuse of discretion standard, we will not lightly substitute our judgment for that of the district court, and will reverse only if we are left with a definite and firm conviction that the court below committed a clear error of judgment." (alterations omitted) (internal quotation marks omitted)).

As the district court observed, "[t]he core of the [parties'] disagreement is over what the verdict question on property damage from the 2007 trial actually asked." The special verdict form asked: "Was the Commercial Point site exposed to hazardous materials in one or more years during the policy period, 1951 to 1969, and did the release of these hazardous materials result in liability from continuing contamination of soil, groundwater, air and/or sediment on the site (property damage)?" The jury answered "yes" for each of the eighteen years of coverage. Boston Gas claims that the jury's response indicates a finding not just that some property damage occurred during each of Century's policy years, but that all property damage occurred exclusively during the 1951-1969 period.

This proposed interpretation of the jury verdict is revisionist. As the trial judge in the Everett litigation explained in ruling that a substantially similar verdict could not

serve as a basis for a pro rata allocation on remand, "[t]his verdict tried on one theory cannot, without some finesse, support another, very different theory." Like the Everett litigation, the Commercial Point litigation proceeded to trial under an "all sums" theory of liability, pursuant to which Century was responsible for Boston Gas's total cleanup costs as long as some property damage resulting in liability occurred during the Century policy period. The jury was therefore not asked to determine the quantum of property damage occurring during each year of Century's policy period or whether damage occurred in other years, as would be required under either a fact-based or time-on-the-risk approach to allocation. Even more critically, the jury was not asked to assess the quantum of property damage occurring exclusively during Century's policy period.

Nor did the verdict form's specification that damage had to "result in liability" render the property damage question a fact-based allocation, as Boston Gas posits. Rather, the role that the inclusion of liability served in the question was as a trigger for coverage. Based on the then-governing "all sums" theory, Boston Gas had argued at trial that the jury should be asked only whether property damage occurred at any point during Century's policy period. Under the language of its policies, Century had no duty to indemnify -- even under an "all sums" theory -- unless that damage resulted in third party liability. Thus, while Century

agreed at trial that there was ongoing groundwater contamination at the site, it argued that such contamination was mild and did not require remediation under the governing regulatory scheme; damage to the soils and sediments, meanwhile, was said by Century to have occurred during plant operations only, which pre-dated the inception of the Century policies. The property damage question merely reflected the fact that Century's liability-based policy would not have been triggered under such a scenario.

Given the limitations of the original jury verdict, the district court's conclusion that it could not serve as a predicate for employing a fact-based allocation was not an abuse of its discretion, and the court therefore did not improperly vacate the jury's verdict. See Mayo v. Schooner Capital Corp., 825 F.2d 566, 570 (1st Cir. 1987) (recognizing "trial court's duty to set aside the verdict and grant a new trial if [it] is of the opinion that the verdict is against the clear weight of the evidence, or is based on false evidence, or will result in a clear miscarriage of justice" (alteration omitted) (internal quotations omitted)).

In addition to properly assessing the impact of the verdict, the district court also acted within its discretion in determining that the trial evidence itself did not permit an accurate fact-based allocation. The district judge carefully reviewed the record and succinctly summarized the timing evidence presented at trial as follows:

The two sides agreed only on one aspect of the timing question, namely that the groundwater contamination had been occurring continuously from the time that the MGP was operative through the time of remediation. Century did dispute that any remediation was necessary to address this contamination.

All other timing issues were hotly contested. The two experts disagreed about whether soil contamination ceased in 1930, when the MGP shut down, or whether it continued after that date. Boston Gas argued that the timing of the soil, groundwater[,] and sediment contamination was continuous from the beginning of plant operations to the present.

Century's expert disagreed, opining that the contamination at several areas of the site occurred during plant operations only.

Other aspects of the timing question were acknowledged to be uncertain by both sides. For example, the disposal of several drums containing non-aqueous phase liquid ("NAPL") contributed to contamination of the site, and neither of the trial experts could say with any specificity when the drums were buried.

Finally, the record is disputed about the timing of contamination of the sediments area of the site, with Century's experts arguing that it occurred during MGP operation and Boston Gas' expert arguing that it occurred continuously over time via underground leaching.

(Internal citations omitted.) The court reasoned that because "almost every aspect of timing of contamination at the site is subject to intense factual dispute or uncertainty, . . . the time on the risk method is the most appropriate and justiciable means of allocation."

The conclusion reached by the district court was reasonable. No plausible interpretation of the evidence presented at trial would permit a jury to pinpoint damages in time and degree with any level of certainty; indeed, Boston Gas's own expert expressly conceded at trial that he could not determine how much

property damage occurred during any given period. Moreover, at no point during the more than a year and a half between the time of remand in Everett and the ruling at issue here did Boston Gas attempt to put forth new evidence that would permit such an allocation, despite (or perhaps because of) an ultimately withdrawn attempt to do so with respect to the Everett site. The Commercial Point site, so it appears from the record, presents precisely the sort of progressive environmental injury for which "it is both scientifically and administratively impossible to allocate to each policy the liability for injuries occurring only within its policy period" and to which a time-on-the-risk calculation should therefore apply. Boston Gas, 910 N.E.2d at 301 (quoting Comment, Allocating Progressive Injury Liability Among Successive Insurance Policies, 64 U. Chi. L. Rev. 257, 257-258 (1997)).

Turning to the application of the time-on-the-risk method, the district court agreed with Century that Boston Gas should be judicially estopped from contradicting its prior statements at trial that contamination was continuous from the time when plant operations began until the time of trial. The court concluded that "[b]ased on the jury's finding of contamination resulting in liability at the site in every policy year, . . . Boston Gas was successful in its argument that contamination was continuous, at least through the end of the policy period." The court therefore ruled that "Boston Gas is bound by its argument

that soil, groundwater[,] and sediment contamination were continuous from the beginning of plant operations through the time of trial, and may not put forward any timing arguments contrary to this position." Boston Gas objects to this ruling, claiming that it was an abuse of discretion that "improperly relieved Century of its burden of proving that other years were implicated by the claim." The objection fails.

Judicial estoppel is an equitable doctrine that "prevents a litigant from pressing a claim that is inconsistent with a position taken by that litigant either in a prior legal proceeding or in an earlier phase of the same legal proceeding." InterGen N.V. v. Grina, 344 F.3d 134, 144 (1st Cir. 2003) (citing Pegram v. Hedrich, 530 U.S. 211, 227 n.9 (2000)). The doctrine's primary purpose is "to protect the integrity of the judicial process." New Hampshire v. Maine, 532 U.S. 742, 749 (2001); accord Alternative Sys. Concepts, Inc. v. Synopsis, Inc., 374 F.3d 23, 33 (1st Cir. 2004) ("The doctrine's primary utility is to safeguard the integrity of the courts by preventing parties from improperly manipulating the machinery of the justice system."). In line with this purpose, we have recognized two conditions that must be satisfied for judicial estoppel to attach. First, "the estopping position and the estopped position must be directly inconsistent, that is, mutually exclusive." Alternative Sys. Concepts, Inc., 374 F.3d at 33. Second, "the responsible party must have succeeded in

persuading a court to accept its prior position."  Id.  We have explained that "[t]he presence of these elements creates the appearance that either the first court has been misled or the second court will be misled, thus raising the specter of inconsistent determinations and endangering the integrity of the judicial process."  Id. (citing New Hampshire, 532 U.S. at 750-51.)

Boston Gas disputes that these elements are satisfied here.  It contends that any discussion at trial about continuous contamination applied only to the groundwater under its owned property, referred to as the Keyspan upland area of the Commercial Point site, and that it "never offered testimony concerning the timing of contamination at [the areas which Boston Gas did not own]," specifically, the Old Colony Yacht Club ("OCYC") area of the Commercial Point site and the sediments adjacent to the OCYC.  Because the jury found the owned property exclusion applicable, the argument goes, Boston Gas cannot be said to have prevailed on its argument urging coverage as a result of continuous groundwater contamination.

The record does not support Boston Gas's characterization of its evidence.  To begin, trial testimony concerning continuous groundwater contamination was not limited to the Keyspan upland area.  To the contrary, it included ample discussion of ongoing damage to the distinct groundwater flow beneath the unowned area of the site, as well.  Furthermore, a full and fair reading of the

-14-

record leaves no doubt that the theory presented by Boston Gas at trial was that once tars and oils entered the ground during plant operations, they caused site-wide, continuous contamination of not only groundwater but also soil and sediments. Boston Gas's expert expressly testified, for example, that "[t]he timing of the contamination is -- was and is basically from the beginning of the plant to present day. The kind of contamination is both soil, groundwater, and sediment contamination." This argument had been previewed during Boston Gas's opening statement, in which it asserted that "releases of tars and oils into soil and groundwater and sediment" had resulted in "indivisible property damage and cumulatively [sic]." It was also echoed at closing, when Boston Gas argued that its remedial efforts were designed to remedy a "continuing process" by "remov[ing] contaminants to soil that have leached into groundwater, into sediments, and into air."

Indeed, absent Boston Gas's argument that contamination at the OCYC and sediment areas was continuous from the time of plant operations, there would have been no factual basis to support the jury's finding that property damage occurred in one or both of those areas during each year of the 1951-1969 Century policy period. See generally Millipore Corp. v. Travelers Indem. Co., 115 F.3d 21, 32 & n.17 (1st Cir. 1997) (highlighting the "well settled" rule of Massachusetts law that the insured bears the burden of proving that damage occurred during the policy period). Boston Gas

suggests otherwise, stating that "The jury heard evidence of contamination caused by 'decommissioning' (demolition) activities at the site during the 1950s and 1960s that could have damaged the OCYC and sediment through subsurface migration." The limited testimony concerning the decommissioning activities, however, indicated that those activities occurred either during or shortly after plant operations -- meaning that any covered property damage resulting from those activities would have been ongoing in the 1920s or 1930s -- or, taking the most appellant-friendly view, at unspecified times in the 1950s or 1960s -- in which case the evidence of these activities would alone be insufficient to support the jury's finding of damage occurring during each of the policy years. See generally Boston Gas, 529 F.3d at 23 (noting that a jury verdict will not stand if "unsupported by any rational view of the evidence"). The district court therefore properly concluded that Boston Gas advanced and prevailed at trial on a theory of continuous contamination.

Boston Gas says, however, that even assuming satisfaction of the two requisite elements for the application of judicial estoppel, applying the doctrine in this case would be inequitable. Specifically, it contends that judicial estoppel is inappropriate because it was not playing "fast and loose" with the court, but merely responding to a change in the law. These considerations, though relevant to the analysis, e.g., Thore v. Howe, 466 F.3d 173,

-16-

184 (1st Cir. 2006) ("Judicial estoppel is, after all, a doctrine of equity."), are insufficient to tip the scales of equity in Boston Gas's favor.

We acknowledge the difficult position in which Boston Gas finds itself. In the words of the district court,

> The fundamental change in the insurance law underlying this case has the potential to spur each party to adopt a position inconsistent with its earlier position. Because pro rata allocation is now the rule, Century now has an incentive to argue that the contamination was continuous over as long a period as possible (to reduce its pro rata share), and Boston Gas has an incentive to argue that the contamination was cabined in as narrow a period as possible (to maximize its recovery from Century).

Be that as it may, this case nevertheless is not of a kind thought to merit an exception to judicial estoppel. This is not, for example, an instance in which "a party's prior position was based on inadvertence or mistake." New Hampshire, 532 U.S. at 753; accord Alternative Sys. Concepts, Inc., 374 F.3d at 35 (recognizing that an exception may be available "if . . . the new, inconsistent position is the product of information neither known nor readily available to [a party] at the time the initial position was taken"); InterGen N.V., 344 F.3d at 144 (declining "to institute a rule that unduly inhibits a plaintiff from appropriately adjusting its complaint either to correct errors or to accommodate facts learned during pretrial discovery"). To the extent that the timing of contamination at the Commercial Point site was knowable at all (as we have seen, the record suggests

-17-

otherwise), that information would have been discoverable by Boston Gas prior to trial. Boston Gas deliberately opted, however, to present a factual scenario under which contamination was continuous. Good faith notwithstanding, Boston Gas may not now "assert a contradictory position simply because its interests have changed." Guay, 677 F.3d at 16; see also id. ("Although we have characterized the archetypal judicial estoppel case as one in which a litigant is playing fast and loose with the courts, such tactics are not a prerequisite for application of the doctrine. A party is not automatically excused from judicial estoppel if the earlier statement was made in good faith.").

Boston Gas's additional argument that the subsequent change in governing law precludes application of the judicial estoppel doctrine is similarly unavailing. Without exception, the cases that Boston Gas cites in support of this contention entail changes in parties' legal positions, not their factual positions. See Longaberger Co. v. Kolt, 586 F.3d 459, 469-71 (6th Cir. 2009) (permitting party to alter legal theory of recovery in response to change in law); Biomedical Patent Mgmt. Corp. v. Cal. Dep't of Health Servs., 2006 WL 1530177, at *5-6 (N.D. Cal. June 5, 2006), aff'd, 505 F.3d 1328 (Fed. Cir. 2007) (permitting party to change legal claim of jurisdiction); Eagle-Picher Indus., Inc. v. Am. Employer's Ins. Co., 678 F. Supp. 15, 16-19 (D. Mass. 1988) (allowing insured to argue different legal theory of "trigger").

-18-

While we have acknowledged that the application of judicial estoppel to changes in legal theories presents "complicated issues," such concerns do not arise where judicial estoppel is applied to prevent a party from asserting inconsistent "historical facts," as Boston Gas attempts to do here. See Thore, 466 F.3d at 182 & n.3. Rather, a party's "directly conflicting statements about purely factual matters, such as 'The light was red/green,'" present precisely the sort of threat to judicial integrity that the doctrine of judicial estoppel was designed to prevent. Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 802 (1999).

Discerning no abuse of discretion in the district court's application of judicial estoppel, we affirm its entry of judgment allocating damages evenly across the 121-year span from the time of plant operations to trial. Consequently, Century is, as was found below, liable for 14.9% of the sum total of Boston Gas's recoverable costs. We next address the district court's rulings on issues that implicate that sum.

**Owned Property**

Boston Gas challenges the district court's denial of its post-trial motion seeking judgment as a matter of law on the owned property exclusion. Before the district court, Boston Gas argued that, in light of uncontested evidence that a driving purpose behind the remediation of the KeySpan upland area was to remedy the impact to the air above the site, the owned property exclusion

-19-

could not apply because Boston Gas does not own the air. The district court denied the motion, concluding that the relevant factor for purposes of the owned property exclusion was whether contamination posed a risk to third party property and citing testimony from which the jury could have found that any air contamination at the site posed no such risk. The court stated, "It is true that Boston Gas does not own the air over its property; however, no third party does either, so if the risk does not extend beyond Boston Gas's own borders, there is no danger of third party liability." Here, too, the district court's ruling must be affirmed.

The denial of a motion for judgment as a matter of law engenders de novo review. Rodríguez-García v. Miranda-Marín, 610 F.3d 756, 765 (1st Cir. 2010). In examining questions of Massachusetts law, our task is to apply the prior pronouncements of the SJC and, in the absence of precedent directly on point, make an informed prediction as to what the SJC would decide if presented with the question. See Andrew Robinson Int'l, Inc. v. Hartford Fire Ins. Co., 547 F.3d 48, 51-52 (1st Cir. 2008). "As to matters of fact, we view the evidence in the light most favorable to the verdict, making no determinations of our own as to the credibility of witnesses or the weight of the evidence, reversing only if a reasonable person could not have reached the conclusion of the

jury." Rodríquez-García, 610 F.3d at 765 (citation omitted) (internal quotation marks omitted).

Arguing on appeal against application of the owned property exclusion, Boston Gas posits that the air is owned by the Commonwealth and thus any impact to the air constitutes third-party property damage. It protests that the district court's determination that "no third party" owns the air would appear to require that privately owned property be affected for the owned property exclusion not to apply. In its view, such a principle would contravene those cases that permit recovery for remediation of surface water contamination notwithstanding that "no private third party owns the surface water."

According to Century, Boston Gas's analogy to groundwater ownership is both inaccurate and inapposite. In an argument that finds support in contemporary case law, Century asserts that the Commonwealth's regulatory interest in ground and surface waters is not the equivalent of ownership, which remains with private landowners. See Gamer v. Town of Milton, 195 N.E.2d 65, 67 (Mass. 1964) ("It [] is, of course, settled in this Commonwealth that a landowner has absolute ownership in the subsurface percolating water in his land."); Walsh v. Hingham Mut. Fire Ins. Co., 24 Mass. L. Rptr. 51, 2008 WL 2097384, at *6 (Mass. Super. Feb. 29, 2008) ("The Commonwealth's extensive regulatory powers over groundwater are nevertheless not the legal equivalent of separate legal

-21-

ownership by the Commonwealth of all groundwater on private property. Private landowners still retain separate ownership rights . . . ." (citing In re Opinion of the Justices, 14 N.E.2d 468, 471 (Mass. 1938))). In any event, Century says, the relevant issue is not who owns the air, but whether releases to the air "infringe upon the public's use or enjoyment of the air or create tangible injury to another's use of its property" -- evidence of which is lacking here.

In Hakim v. Massachusetts Insurers' Insolvency Fund, 675 N.E.2d 1161 (Mass. 1997), the leading Massachusetts case on the owned property exclusion in environmental spill cases, the SJC considered whether the owned property exclusion in the plaintiff's liability policy barred coverage for costs incurred for the cleanup of on-site soils following an oil spill on its property. See id. at 1163. As we have previously explained, "the court held that when pollutants have migrated from the insured's property to an adjacent property -- or perhaps even when the threat of such migration is imminent -- 'coverage [to remediate the insured's property] is not barred if the [on-site] cleanup is designed to remediate, to prevent or to abate further migration of contaminants to the off-site property.'" Boston Gas, 529 F.3d at 16 (quoting Hakim, 675 N.E.2d at 1164 & n.8) (emphasis omitted); accord Rubenstein v. Royal Ins. Co. of America, 694 N.E.2d 381, 389 (Mass. App. Ct. 1998) (construing Hakim).

Courts applying Hakim in cases involving groundwater contamination have uniformly done so in a manner contrary to Boston Gas's position here, rejecting the notion that an insurer's duty to indemnify could be triggered by contamination of groundwater that is located solely on the insured's property and poses no threat of off-site migration. See, e.g., Fitchburg Gas & Elec. Light Co. v. One Beacon Am. Ins. Co., 27 Mass. L. Rptr. 567, 2010 WL 5490148, at *2 (Mass. Super. Nov. 26, 2010); Walsh, 2008 WL 2097384, at *5-6; Mass. Elec. Co. v. Commercial Union Ins., 29 Mass. L. Rptr. 148, 2005 WL 3489896, at *1-2 (Mass. Super. Oct. 18, 2005); Preferred Mut. Ins. Co. v. Gordon, 2003 WL 21077026, at *13-14 (Mass. Super. May 13, 2003). They have done so, moreover, irrespective of their views of groundwater ownership. Compare Walsh, 2008 WL 2097384, at *6 ("Because the Commonwealth's extensive regulatory interest in groundwater on private property is not the equivalent of ownership, liability coverage for pollution damage to groundwater on the insured's property is excluded by the exclusion for damage to property owned by the insured."), with Massachusetts Elec. Co., 2005 WL 21077026, at *1 ("This court rejects the defendants' argument that groundwater is the insured's property for purposes of the owned property exclusion, given the current understanding of groundwater as a shared public resource and the complexities of environmental contamination and cleanup."). One court, in fact, has expressly "decline[d] to base [its] decision on real property

ownership issues with respect to groundwater." Preferred Mut. Ins. Co., 2003 WL 21077026, at *14.  After careful analysis of the governing law, the court concluded that "[a]s long as there is a significant threat of the contaminated groundwater's migrating off the [insured's] Property, then [the insurer's] duty to indemnify [the insured] is triggered."  Id. at *14.

These cases evince a concern not with ownership of the vehicle by which the migration of contaminants occurs, but whether such migration poses a significant risk to the public or to private third parties' use and enjoyment of their property.  This approach, in our view, is consistent with both Hakim and the nature of liability coverage, which is "designed to indemnify the insured when a claim by another party (including a claim by the Commonwealth) requires the insured to incur costs to reduce the damage to another person's property or to compensate the other person for . . . damage to his or her property."  Walsh, 2008 WL 2097384, at *5.  We therefore find it unnecessary to delve deeper into property law and land use issues concerning air rights above Boston Gas's property.  Rather, we conclude that Boston Gas is entitled to judgment as a matter of law on the owned property exclusion only if the evidence indubitably established a significant risk of migration.

A reasonable jury could be persuaded that no such evidence existed here.  While Boston Gas contends that there was

-24-

uncontested evidence of impact to the air at the site, there was also ample evidence from which a jury could find that any such impact posed no risk beyond Boston Gas's borders. When asked whether "the air over the Boston Gas land might have been a danger to human health," Century's expert explained:

> No, I don't think so, that's the case at all. The inhalation risk is a confined space issue, and if you send a worker into an excavation, there's all sorts of training requirements. That would be what the risk is. It would be a worker in a confined space who may breathe this, not somebody who is walking on the surface of the site.

Boston Gas's own risk assessment report for the Commercial Point site similarly indicated that the "inhalation risks" of which Boston Gas complains derived solely from direct releases from soil caused by Boston Gas's own use of its property, specifically "inhalation of soil-derived dust (at ground surface and in an excavation)" and "inhalation of COPCs [Constituents of Potential Concern] volatized from soil into an excavation." That report further concluded, "The Massachusetts Air Quality Standards related to ambient concentrations of so-called 'criteria pollutants' (sulfer oxides, particulate, carbon monoxide, nitrogen dioxide and lead), which are not among the COPC for the Site."

A reasonable jury could determine from this evidence that inhalation risks related solely to Boston Gas's use of its own property and presented no potential for third party impact. Absent

such potential, Boston Gas's motion for judgment as a matter of law on the owned property exclusion was properly denied.

**Damages**

Boston Gas's next claim of error pertains to the district court's disposition of Century's post-trial motion to correct the verdict.  In that motion, Century asserted that the jury mistakenly awarded Boston Gas the sum of the stipulated costs of investigating the entire site ($297,085.46) and investigating and remediating the KeySpan upland area (Boston Gas owned property that should have been excluded from coverage) ($1,402,060.33) instead of subtracting that amount (totaling $1,699,145.79) from the total costs ($2,717,693.44) to arrive at what Century argues would have been the correct final covered damages amount ($1,018,547.65).

The damages question on the verdict form asked:  "What is the amount Boston Gas Company (or KeySpan) has been legally obligated to pay for the investigation and/or remediation as a result of property damage at the Commercial Point site for which coverage was not excluded?"  Century posited that the jury overlooked the word "not" and thus inadvertently entered the amount that it found was excluded under the owned property exclusion.  This "clerical mistake," Century argued, was "mathematically certain to a penny" and subject to correction under Federal Rule of Civil Procedure 60(a).  See Fed. R. Civ. P. 60(a) ("The court may correct a clerical mistake or a mistake arising from oversight or

-26-

omission whenever one is found in a judgment, order, or other part of the record.").

The district agreed that it was "highly probable that a mistake was made" in recording the verdict but concluded that "the mistake appears to have been substantive rather than clerical." See generally Bowen Inv., Inc. v. Carneiro Donuts, Inc., 490 F.3d 27, 29 (1st Cir. 2007) ("The relevant test for the applicability of Rule 60(a) is whether the change affects substantive rights of the parties . . . or is instead a clerical, or a copying or computational mistake, which is correctable under the Rule." (quoting In re Tex. Marktg. Corp., 12 F.3d 497, 504 (5th Cir. 1994))). The court reasoned that even if Century was correct that the jury misread the verdict question as requesting the amount of Boston Gas's liability that was subject to exclusion, its explanation failed to account for the jury's inclusion in that amount the entire $297,085.46 in general site investigation costs. The court observed that the jury was unlikely to have found all of the general site investigation costs excludable.

The court likewise rejected Boston Gas's defense of the verdict, deeming Boston Gas's proffered scenario highly unlikely: that "the jury worked through each invoice for the KeySpan area, determined what amounts were spent to remediate Boston Gas's owned property, and derived an amount that [coincidentally] corresponded exactly to the difference between the stipulated total cost and the

-27-

stipulated costs at the KeySpan area plus the general site investigation costs." Finding it improbable that four years after trial "any of the jurors would recall their deliberations, let alone the trial evidence, with sufficient precision to clarify the verdict," the court vacated the damages award as against the weight of the evidence and ordered a new trial on the limited issue of which of the costs are subject to the owned property exclusion.

A trial court is authorized to grant a new trial if it determines that "the verdict is against the weight of the evidence . . . ." Jennings, 587 F.3d at 438. Our review of the district court's grant of a new trial is for abuse of discretion. Id. Despite Boston Gas's protestations to the contrary, there was no such abuse here.[1]

---

[1] Boston Gas also argues that Century forfeited its right to challenge the jury verdict by failing to raise its objections while the jury was still empaneled. This argument conflates the standards applicable to challenges to substantive inconsistencies in a jury verdict and those complaining of clerical error only. Compare Howard v. Antilla, 294 F.3d 244, 250 (1st Cir. 2002) ("[T]he only efficient time to cure . . . possible problems of inconsistency would be after the jury announced the results of its deliberations and before it was excused . . ."), with Bowen Inv., Inc. v. Carneiro Donuts, Inc., 490 F.3d 27, 29 (1st Cir. 2007) (noting that a motion for request for relief under Fed. R. Civ. P. 60(a) can be filed "at any time after judgment enters"). Here, Century claimed clerical error and therefore was not required to mount its challenge prior to the jury's release. And while the district court rejected Century's suggestion of clerical error, it did not treat the issue as one of internal inconsistency, which would have required a more speedy response from Century, see Howard, 294 F.3d at 250. Instead, the district court invoked the "against the weight of the evidence" language associated with Fed. R. Civ. P. 59(a)(1)(A). Jennings v. Jones, 587 F.3d 430, 436 (1st Cir. 2009). We therefore find no forfeiture of the issue.

The district court carefully evaluated the parties' arguments and reasonably concluded that neither was adequate to support the jury's damages calculation. It is true, as Boston Gas asserts and the district court acknowledged, that in addition to receiving a summary of stipulated costs per area, "[t]he jury had access to specific invoices that could have allowed it to determine with particularity what costs were spent on soil remediation [at the KeySpan upland area] as opposed to addressing third party property." But the likelihood that a jury's review of those invoices would have resulted in a <u>covered</u> damages amount precisely corresponding to the sum of general site costs and <u>excluded</u> costs entered into evidence is infinitesimal. The improbability of Boston Gas's scenario would appear to lend credence to Century's argument that the jury simply reversed the recoverable and unrecoverable amounts.[2]

Century's proposed interpretation of events is not, however, without its own shortcomings. In a ruling that is not

_____

[2] Century further argues that the jury could not have apportioned costs in the manner suggested by Boston Gas because the owned property exclusion was submitted to the jury on an "all or nothing" basis, a contention that Boston Gas necessarily rejects. Finding independent grounds to support the grant of a new trial, we need not resolve this dispute here. We emphasize, however, that we have previously held that an "all or nothing" approach to the owned property exclusion is improper, <u>see</u> <u>Boston Gas</u>, 529 F.3d at 16-17; <u>see also</u> discussion of investigation costs, <u>infra</u>, and that, as such, the jury on remand should be permitted to determine whether and to what extent costs associated with the owned property were incurred to assess and prevent off-site damage.

challenged on appeal, the district court rejected Century's contention that investigation costs amount to defense costs for which it is not obligated to pay under the language of its policies. The court reasoned that "[b]ecause . . . assessment [of the environmental damage at the site] was an indispensable step in the ultimate remediation process, the 'investigation costs' actually at issue here are a subcategory of remediation costs." See Martignetti v. Haigh-Farr Inc., 680 N.E.2d 1131, 1140 n.22 (Mass. 1997) (noting that under Mass. Gen. Laws ch. 21E, "'[r]esponse' is defined . . . as including assessment, containment, and removal" (emphasis added)); 42 U.S.C. § 9601(23) (defining the term "removal" under the analogous federal statute as including "such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances"). Pursuant to this ruling, general site investigation costs are compensable to the extent that they were necessary to assess threats to third party property. Cf. Boston Gas, 529 F.3d at 17 (stating that under the owned property exclusion, "only that remediation necessary to protect against off-site contamination is compensable; further costs, however useful to mitigate on-site contamination, are not"). As Boston Gas points out, the jury heard testimony and had access to environmental reports from which a rational fact-finder could infer that the general site investigation costs were incurred at least in part for that

purpose. "Therefore," as the district court concluded, "the theory that the jury found all of the [general] site investigation costs excluded under the owned property exclusion is similarly unlikely."

Unable to reconcile the damages award with the arguments and evidence presented at trial, the district court properly vacated the verdict as being against the clear weight of the evidence. While Boston Gas accuses the district court of improperly invading the province of the jury, we view its decision to grant a new trial as designed to avoid just that. In short, there was no abuse of discretion.

## Newly Discovered Contamination

Boston Gas lastly complains of the district court's ruling that newly discovered contamination at the Commercial Point site should be addressed by way of a separate legal action. Shortly before the issuance of the memorandum and order on which the judgment in this case is based, Boston Gas filed a "Motion to Adjourn the Trial Date in favor of a Status Conference to Address New Areas of Contamination." In that motion, Boston Gas informed the court that it had recently discovered "substantial additional contamination at Commercial Point that will require further investigation and remediation at areas that are different from the areas of contamination that were tried in 2007." It requested that the district court permit further discovery, expert opinions, and a trial on the timing of the new area of contamination. Boston Gas

contends that the court's refusal to do so amounts to reversible error because it "promotes improper claim splitting, and could subject the later action to principles of res judicata." In response, Century argues that Boston Gas waived any right to contest this ruling by stipulating to a declaratory judgment entitling it to "14.9 percent of reasonable and necessary future investigation and/or remediation costs relating to offsite property damage <u>at or around</u> the Commercial Point site for which Boston Gas is liable, up to the Century insurance policy limits." (Emphasis added.)

We need not tarry. The district court enjoys broad discretion in determining whether to hold separate trials in the same case. <u>Associacion De Periodistas De P.R.</u> v. <u>Mueller</u>, 680 F.3d 70, 77 (1st Cir. 2012). Similarly, district courts enjoy broad discretion in managing their dockets, and we will reverse the denial of a continuance only for abuse of that discretion. <u>Delgado</u> v. <u>Pawtucket Police Dep't</u>, 668 F.3d 42, 50 (1st Cir. 2012). The district court's decisions here, based on the need for closure of this decade-long action, fell well within the encincture of that discretion. Whether and to what extent litigation concerning newly discovered contamination is barred by the doctrine of res judicata or by the reach of the declaratory judgment is a matter for the district court to determine in the first instance if and when the issue arises.

## Conclusion

For the reasons set forth above, we affirm the district court in all respects and remand for further proceedings in accordance with this opinion. We do so noting, once again, that "[t]his litigation, plainly unusually complicated, has been well-handled by the district court," and urge "the parties . . . to consider whether a settlement between them is feasible before more time and expense is devoted to further litigation." Boston Gas, 588 F.3d at 23-24.